(No. 19657.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PAUL SAMPSON, Plaintiff in Error.

*Opinion filed December 20, 1929—Rehearing denied Feb. 8, 1930.*

HARRY I. HANNAH, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, R. B. FOSTER, State's Attorney, and JOEL C. FITCH, for the People.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

Paul Sampson (hereafter referred to as defendant) is a married man twenty-five years of age, residing in Mattoon, Illinois, and was indicted at the September term, 1928, of the circuit court of Moultrie county. The indictment consisted of four counts, the first, third and fourth of which were quashed. The second count charged defendant with burglarizing the chicken house of Harry McClure, in Moultrie county, with the intent to steal the goods, chattels and property of McClure. A trial was had by a jury and defendant was found guilty as charged. The court overruled motions for a new trial and in arrest of judgment and rendered judgment upon the verdict, sentencing the defendant to the Illinois State reformatory at Pontiac. The defendant has sued out this writ of error to review the judgment.

The principal errors assigned and argued are: (1) The evidence is insufficient to support the verdict; (2) no entry or intent was shown; (3) ownership of the property stolen was not proven; and (4) the court erred in denying the motion for a new trial.

The evidence presented on behalf of the People was substantially as follows: Harry McClure, his wife and family resided on his farm about twelve miles northeast of Sullivan, in Moultrie county, and about eighteen miles from Mattoon, in Coles county, Illinois. The chicken house on his farm was located about 150 feet from the dwelling.

The chicken yard was cindered and the floor of the chicken house was of dirt. There was a wire attached to the door of the chicken house in such a way that when it was closed the door could be fastened. The door was usually propped open so that the chickens could pass in and out. A public highway extended north and south in front of the dwelling house. There was a hedge fence along this road, and about 100 yards north of the chicken house there was a low place in the hedge fence through which one might pass from the chicken yard and through the orchard into the road. On July 25, 1928, McClure and his entire family left his home about 7:00 o'clock P. M. for Arthur, Illinois, and did not return until about 10:30 that evening. The McClures had on their farm at this time about one hundred and fifty chickens. They also owned a collie dog, which barked a great deal when strangers came to the farm. When the McClures returned from Arthur they paid no particular attention to the chicken house nor did they hear any unusual noises during the night. About daylight the following morning Mrs. McClure went to the chicken house to attend to the little chickens, and she noticed that the prop to the chicken house door was down and that the door was almost shut. She summoned her husband to view the situation, and they found that the wire on the chicken house door had been broken; that a gunny sack which did not belong to them, containing a little grain and coal, was lying under the roost, and that an unusual amount of chicken feathers was scattered about in the chicken house. Upon further investigation they found chicken feathers near the hole in the hedge fence, a quantity of feathers in the road near by, and also the newly-made tracks of an automobile on the side of the road. The sheriff of the county was called, and he, with the State's attorney, came to the McClure farm, where all of them made an examination of the premises. The tracks made by the automobile in the soft dirt on the side of the road near the hole in the hedge

fence were carefully studied by the sheriff, who made a plat or sketch of them. The sheriff's examination disclosed that two of the tires were badly worn and that the other two were sufficiently new to make a good print of the tread in the dirt. The McClures owned Buff Orpington, a mixed breed of Barred Plymouth Rock, Rhode Island Red and Leghorn chickens. They estimated the number of chickens taken on the night of July 25 to be between forty and fifty. After the officers and the McClures had made their investigation at the latters' farm on the morning of July 26 the McClures drove to Mattoon and visited the Figenbaum Poultry House there. The manager and one of his employees said they had bought forty-one chickens that morning about seven o'clock from Paul Sampson. The chickens they bought were four Buff Orpingtons, thirty-two Barred Rocks, four White Leghorn hens and one white rooster. The chickens purchased that morning by the poultry company had been placed in separate batteries or coops, and apparently some of them had been sold prior to the time the McClures arrived there. The chickens still in the possession of the poultry company were shown to the McClures, who identified about eight chickens. One Buff Orpington hen was particularly identified by them because she had been in a mud-hole some days before and was covered with mud. Mrs. McClure said positively that this hen belonged to them. The other chickens had no particular marks of identification upon them, except that the Barred Rocks were somewhat unusual in that they were a mixed breed. The chickens identified by the McClures were separated from the others and held for them, though they did not return for them until about ten days or two weeks later. The poultry man had sold them, stating that they were deteriorating from being cooped up too long. The poultry house manager and his employee told the McClures that Sampson's name was placed on their record of purchases made that morning and that a check was given him in pay-

ment for the fowls. The chickens were taken to the poultry house in a Ford coupe, the license plate number of which Figenbaum put down on his record book. The sheriff of Moultrie county obtained the license number of the Ford coupe in which the chickens were brought to the Figenbaum Poultry House on the morning of July 26, and also ascertained through the Secretary of State's office that Sampson, the defendant, was the owner of the car. The sheriff later received some information from the Mattoon police and on August 9 went to the house in Mattoon where the defendant was staying and examined the Ford car in the yard. The license plate on the car at that time corresponded with the license number which the sheriff had previously obtained from Figenbaum. The tread of the tires then on the car, according to the testimony of the sheriff, also corresponded with the tracks or tread of two of the tires which the sheriff found in the dirt at the side of the road near the gap in the hedge fence north of the McClure house on the morning of July 26.

The defendant testified in his own behalf and denied that he had stolen the chickens from the McClure farm or that he had been in Moultrie county on that night. He admitted that he sold some chickens to the Figenbaum Poultry House in Mattoon on the morning of July 26. He stated, in substance, that on the night of July 25 he, his wife and child attended a tent show in Mattoon and arrived home about 10:30 o'clock that night. He said he was at home the rest of the night. He saw Mr. and Mrs. Howard at the show and talked with Howard. Fred Sampson, the defendant's brother, who is sixteen years of age, came to defendant's house about 11:00 o'clock that night, where they had some muskmelon before he went home. By arrangement that night Fred returned to defendant's house next morning about 6:00 o'clock for the purpose of having defendant take him about three miles south of Mattoon to the Sellew farm, where his older

brother, Roy, was working. The younger brother was to obtain employment running a tractor. While on the way to the Sellew farm defendant and Fred stopped near a bridge over a drainage ditch, about a mile or so south of Mattoon, to fix a flat tire on defendant's car. While there Fred went down under the bridge and found two crates of chickens. He returned and reported this to defendant, and the latter stated he decided to take the chickens back to Mattoon and sell them. After fixing the tire they placed the crates of chickens on the rear of the Ford car, took them to the Figenbaum Poultry House in Mattoon and sold them. Defendant kept all the money. He then took his brother Fred out to the Sellew farm, returned, and later went to the place in Matton where he was employed as a yard-man. He testified there were no marks of identification of any kind upon the chickens or the crates which his brother found under the bridge. He also stated that he was told later that these chickens did not come from McClure's, and that his best recollection was that the party said the chickens came from Tom Lidster's, near Coles Station, in Coles county. Defendant's testimony as to being in attendance at a tent show in Mattoon the evening of July 25 was corroborated by Everett Howard and his wife and to some extent by his brother Fred. His evidence relative to the finding of the two crates of chickens was also corroborated by his brother Fred. During the day of July 26 defendant's wife received a telegram that some relative of hers had died in Alabama, and late that afternoon defendant made preparations to take his wife to Alabama in his Ford car. He placed two new tires on his car. These tires he had purchased on July 21 and they had not previously been on the car. He and his wife returned from Alabama about the 6th or 7th of August. Two or three days after their return defendant went to the Mattoon Tire Company and had two new tires put on his car to replace the ones he bought on July 21. He received an adjust-

ment upon the other tires, which did not wear well on his trip to Alabama.

The foregoing is the substance of the most important testimony presented at the trial.

In the view we take of this record only the first and fourth contentions of counsel for defendant are of sufficient consequence to receive our consideration.

Counsel first contends that the evidence does not prove the guilt of defendant beyond a reasonable doubt. A large part of the evidence is circumstantial. It is not frequent that burglary can be proven by the direct and positive evidence of persons who have knowledge of the actual breaking and entry. The inference of guilt, in most instances, must necessarily be drawn from other facts satisfactorily proved. It seems quite unnecessary to re-state or discuss the facts, which we have set out somewhat in detail. Without question the record shows the chicken house of Harry McClure was entered during the night of July 25, 1928, and approximately forty of his chickens were taken. The same kinds of chickens as those owned by McClure and stolen from his farm were sold by defendant early the next morning at a Mattoon poultry house, where some of the stolen property was identified by McClure and his wife. The defendant's explanation of how he came into possession of the chickens, and the fact that he made no effort whatever to ascertain the owner of the property prior to making an early sale of it and kept all of the money, do not impress one with his innocence. In addition thereto we have the sheriff's testimony that the tire tread-marks in the dirt at the side of the road near the hedge fence on McClure's farm on the morning after the chicken theft were the same as the tread of at least two of the tires which were on defendant's Ford coupe a few days later. There is no invariable rule as to the quantum of proof necessary to establish the *corpus delicti*. Each case must depend in a measure upon its own particular circumstances.

(*People* v. *Goodwin,* 263 Ill. 99; *People* v. *Callahan,* 324 id. 101.) The possession of stolen property, the proceeds of a burglary or larceny, soon after the commission of the offense is evidence of the guilt of the person or persons in whose possession it is found, and is sufficient to warrant a conviction unless such possession is explained or unless there appears from all the evidence a reasonable doubt of the defendant's guilt. (*Williams* v. *People,* 196 Ill. 173; *People* v. *Brown,* 325 id. 307.) The explanation of the possession and sale of the chickens by defendant, in the judgment of the jury, evidently was not sufficient to raise a reasonable doubt as to his guilt of the crime of burglary, and we think the jury's conclusion is fully sustained by the evidence in the record.

It is further contended the court erred in denying the motion for a new trial. One of the grounds in support of this motion has just been discussed. The additional reason for the motion was that newly discovered evidence would, when presented, cause a different verdict to be returned by a jury. Affidavits of several persons were presented in support of the motion. Two of the affidavits were made by the owner of the tire shop and one of his employees and pertained to the kind and tread of tires purchased by defendant on July 21, and the same concerning the two tires purchased and placed upon the rear wheels of defendant's car after his return from Alabama and prior to the time the sheriff examined his car and tires in Mattoon on August 9. The purpose of the affidavits was to show that the tires on defendant's car on August 9 were not like and did not have the same tread as those which made the tracks in the road near McClure's house at the time the chickens were stolen. These affidavits do not refute the probable situation that two of the tires making the tracks in the road near McClure's house were still on defendant's car when the sheriff examined the car. Some of the other affidavits filed are merely cumulative, and one

relates to statements alleged to have been made by defendant's older brother that he stole the chickens from a man who lived in Coles county and placed them under the bridge where the defendant and his younger brother found them. None of the affidavits contain newly discovered evidence which might not have been obtained at a much earlier date by the exercise of due diligence. Applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts and when presented are rightly subjected to unusual scrutiny. The allowance of such an application is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in a case of manifest abuse. (*People* v. *Laures*, 289 Ill. 490.) We cannot say there was any abuse of discretion, and it is quite doubtful that the alleged newly discovered evidence would cause any different conclusion to be reached by a jury.

We find no reversible error in the record, and the judgment of the circuit court will therefore be affirmed.

*Judgment affirmed.*