(No. 21193.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MAX GEISLER *et al.* Plaintiffs in Error.

*Opinion filed April 23, 1932—Rehearing denied June 10, 1932.*

W. W. SMITH, and EDWARD M. KEATING, for plaintiff in error Max Geisler; HAROLD LEVY, for plaintiff in error Jack Sopkin.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

Max Geisler and Jack Sopkin, with one Lieberman, were tried in the criminal court of Cook county on the charge of burglary. Lieberman was found not guilty but the defendants Geisler and Sopkin were found guilty and their punishment fixed at imprisonment in the penitentiary. The case is before us on a writ of error.

The defendants have separate briefs. Similar points are made and argued in the briefs, with the exception that the brief of Geisler makes the additional point that the trial court committed error in refusing to grant him a new trial. The common points made and argued by both defendants are: (1) That the identification of the defendants as the

burglars is indefinite; (2) that the prosecution failed to prove the material allegations of the indictment, which contained two counts: (a) breaking and entering with force; (b) entry without force, the doors and windows being open; and (3) that the court erred in refusing to give a certain instruction.

About one o'clock in the morning of October 11, 1930, Thomas Kent, a night foreman of John Sexton & Co., while in the performance of his duties met two armed men at the top of the stairway leading from the basement of the plant to the first floor. They forced Kent to walk in front of them up two flights of stairs to the main office of the company. Here they located the night watchman, named Post, and marched Kent and Post down-stairs to the driver's room, where the two employees were compelled to lie on the floor. A second watchman who was on his rounds pulling the signal boxes was also gathered up by the two burglars, who took his signal-box key from him. Post was then compelled to go around the factory and pull the rest of the signal boxes, Kent and the second watchman being forced to accompany them. About thirty men were working in the plant that night, and as the two bandits came upon other employees they were rounded up and made to follow behind Kent and Post. The whole group of corralled employees were then taken to the office and made to lie on the floor. Post was then marched to the sixth floor of the plant and compelled to pull all of the signal boxes, after which he was escorted down-stairs by one of the burglars, tied up and told that he would be called again at two o'clock. The evidence is clear and indisputable that everywhere the two burglars went in the plant it was well lighted.

All the evidence for the People concerning the identity of the defendants came from the employees who were working that night. Foreman Kent testified that one of the two men was very short and stout; that when he first saw him at the head of the stairs he did not have his face concealed

by any sort of mask but fastened a handkerchief over his face while standing there. Kent obtained a view of his face before it was concealed. He said that this short, heavy-set man spoke broken English; that he wore a gray-colored sweater-coat and cap, and that the handkerchief over his face did not completely conceal his features. Kent pointed out the defendant Sopkin as this man and stated that he had previously identified him at a preliminary court hearing. The other burglar, according to Kent, was taller than Sopkin by three or four inches and would weigh about 150 pounds, had light-colored hair, possessed a clear, natural voice devoid of peculiarities and was dressed in a light-colored suit. As a mask this other burglar held a handkerchief before his face, but despite this Kent said that he saw all of his features. His description coincides with that of the other witnesses who identified Geisler. Post did not see the face (except the eyes) of the shorter of the two burglars but did hear his voice, and testified that he recognized Sopkin as this man at the preliminary hearing. He further said that this short man spoke broken English and wore a dark sweater and cap, the sweater being a peculiar shade of gray. Post did not identify Geisler. George Rauchenecker saw the watchman, Post, pulling the signal boxes instead of the man regularly assigned to that task. He said that Post was then accompanied by a man about five feet five inches in height who had his face about half covered with a handkerchief. This short man leveled a revolver at Rauchenecker and commanded him to fall in line with Post. Rauchenecker testified that notwithstanding the mask he was able to see the outlines of the burglar's features, the upper part of the face and both of his eyes being exposed. This man was identified by Rauchenecker as Sopkin at the preliminary hearing. This same witness furnished the first testimony to show that Geisler was the taller of the two men. Rauchenecker pointed out Geisler at the trial and said he could identify him as the taller man be-

cause this taller man exposed his face in profile on the night of the burglary and endeavored to conceal his features by holding a handkerchief in front of his face. According to Rauchenecker's testimony this man weighed about 150 pounds, was taller than his companion, had a sandy complexion, was dressed in a light-gray suit and hat and was clean shaven. Rauchenecker did not at first pick Geisler out of a group of men at the preliminary hearing but later was positive in his identification. Witness Podgar could not identify Geisler but did identify Sopkin. He based his identification upon the fact that he was able to see part of his face, and that he was a short man and wore a gray suit and cap. A witness by the name of Hamall said that Sopkin held a handkerchief to the side of his face. He made the identification from what he saw of the shorter man's features at that time, coupled with the fact that he was "low set" and dark. He also testified that this short man was dressed in a gray-colored sweater and wore a cap. He said the taller of the two men had a light complexion and endeavored to conceal his features by holding a handkerchief before his face; also that he wore a light-colored hat. Hamall was positive that Geisler was one of the two burglars. The testimony of the above named witnesses has some things in common, the chief of which is that they made their identifications of the two accused men before they were acquainted with their names, solely upon the fact that the two defendants fitted the descriptions of the two burglars as impressed upon their minds at the time of the burglary.

Sopkin and Geisler both denied their presence at the scene of the crime or any knowledge of it. Sopkin relied largely upon an alibi built upon his own story and the testimony of a relative. Geisler could not say where he was or what he was doing at the time of the burglary and his story is not supported by the testimony of others. Much is made by Geisler of the fact that a witness for the People stated that he was the possessor of a black eye when he was

identified in court on November 3, while a physician for the county jail testified that a fellow-prisoner of Geisler's was the possessor of the black eye. This conflict of testimony was for the jury to weigh and determine. The point was made by both defendants that the People's witnesses never testified to having seen either of the two defendants before the night of the crime, and that when those witnesses confronted the defendants for the purpose of identifying them the circumstances surrounding that meeting might have influenced the witnesses to identify the two defendants. A careful examination of the whole record fails to reveal any circumstances surrounding the identification of the defendants which appeared to have any such influence upon the witnesses. As we have stated before, the identifications were all made before the witnesses knew who the defendants were. The defendants were picked out from others by the witnesses as a result of impressions gained by first-hand observation. A reading of the testimony plainly shows that exterior circumstances did not sway the witnesses when they made their identifications. We have said repeatedly that the law has committed to the jury the determination of the credibility of the witnesses and the weight of their testimony, and where the evidence is conflicting this court will not substitute its judgment for that of the jury. (*People* v. *Chaney,* 342 Ill. 175.) The determination of the conflicting testimony concerning the identification of the defendants was one solely for the jury. *People* v. *Fisher,* 303 Ill. 594; *People* v. *Terracco,* 346 id. 423.

The second point made by the defendants is that the People have failed to prove that the factory building was entered either with or without force. The People proved conclusively that two men armed with deadly weapons came into this particular building without the permission of the owners and that they did not come on an errand legitimately connected with the business conducted by Sexton & Co.

The evidence of the unlawful force used in the building by the two armed and partly masked robbers, coupled with the intimidation of the employees, constitutes sufficient proof that the place was entered with the full intent to commit a felony. The case of *Bromley* v. *People,* 150 Ill. 297, relied upon by defendants, is not in point, as in that case the indictment charged that the crime was committed "in the night time" while the proof showed that it was committed in the day time. In the present case there is no charge that the defendants broke and entered at any particular time. The charge in one count of the indictment is that they broke and entered, and in the other count that, the doors and windows being open, they entered. Intent to commit a burglary can be inferred from the facts and circumstances proved in the case. (*People* v. *Lawson,* 328 Ill. 602.) Burglary can seldom be proved by direct evidence of the actual breaking and entry, and the inference of guilt in most cases must necessarly be drawn from other facts satisfactorily proved. *People* v. *Sampson,* 337 Ill. 643.

The instruction which the defendants claim the court erred in refusing to give was as follows:

"The court instructs the jury that before they can convict the defendants of the charge in the indictment, each juror must be satisfied beyond a reasonable doubt and to a moral certainty, of their guilt. The responsibility rests upon each and every juror to arrive at a verdict from the evidence in the case, and the verdict of the jury should be the verdict of each and every juror, and should be an expression of his individual conclusion from the evidence. And you are instructed that while it is the duty of the jurors to use all reasonable endeavors to agree upon the issues of a case submitted to them, and in order to do this it is fitting and proper that they should consult the judgment of one another in the consideration of the testimony in an honest endeavor to arrive at a verdict, yet you are instructed that the verdict returned by you into court should

represent the judgment of each juror, and no juror should permit or suffer himself to sign a verdict that does not represent his honest belief and conclusions from the evidence and if any juror in this case has a reasonable doubt of the guilt of the defendant after consulting with his fellow-jurors in a careful consideration of the evidence, he should abide by that conviction. No juror should allow himself to sign a verdict against his conviction founded on the evidence for the purpose of obtaining an early release, to accommodate other jurors who may think differently, or because a majority of the jurors may be of a different belief as to the issue in this case."

The wording of the instruction offered would tend to encourage a disagreement of the jury, and under numerous decisions of this court the instruction was properly refused. *People* v. *LeMorte,* 289 Ill. 11; *People* v. *Lee,* 237 id. 272; *Addison* v. *People,* 193 id. 405.

The further point made by Geisler is, that the trial court erred in refusing to grant his motion for a new trial in view of affidavits filed. By these affidavits Geisler endeavored to show that the jury's verdict was the result of a compromise; that of thirty witnesses of the alleged crime only six testified for the People, only two of these six identified Geisler, and the testimony of one of these two was refuted by that of another witness. No abuse of discretion is shown by the court in denying the motion for a new trial. A trial court is not bound to act on affidavits made by the defendants and their attorneys, (*People* v. *LeMorte, supra,*) and a juror's affidavit cannot be considered for the purpose of impeaching the verdict. *People* v. *Quinn,* 313 Ill. 351.

The record fails to disclose any reversible error, and the judgment of the criminal court will therefore be affirmed.

*Judgment affirmed.*