(No. 53289.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. ROBERT HOUSBY, Appellant.

*Opinion filed March 31, 1981.*

416

RYAN, J., took no part.

Robert Agostinelli and Thomas Lilien, of the Office of State Appellate Defender, of Ottawa, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Marsha Freidl, Assistant Attorney General, of Chicago, of counsel), for the People.

MR. JUSTICE SIMON delivered the opinion of the court:

In this appeal the court is concerned with the perplexing problems caused by the use of presumptions in criminal cases. Presumptions and inferences are evidentiary substitutes for the facts inferred. For that reason, instruc-

tions to a jury that it can infer an ultimate fact from a proved fact frequently raise due process objections. The thrust of these objections is that the presumption takes the place of strict proof of the elements of the offense, each of which must be established beyond a reasonable doubt. *In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1072-73.

Such an instruction (Illinois Pattern Jury Instructions, Criminal, No. 13.21 (1968)) (hereinafter IPI) was given at defendant Robert Housby's trial in the circuit court of La Salle County on charges of burglary (Ill. Rev. Stat. 1977, ch. 38, par. 19—1) and theft (Ill. Rev. Stat. 1977, ch. 38, par. 16—1(a)). He was convicted of both offenses. A divided appellate court affirmed. (82 Ill. App. 3d 537.) The instruction read:

"If you find that the defendant had exclusive possession of recently stolen property, and there was no reasonable explanation of his possession, you may infer that the defendant obtained possession of the property by burglary."

Housby's brief concedes that the evidence tends to show that he dealt with stolen property, and that this would sustain his conviction for theft. (*People v. Marino* (1970), 44 Ill. 2d 562, 576.) But he attacks his burglary conviction, attributing it to the instruction. He contends the instruction mandated the jury to draw an inference which deprived him of due process and compelled a verdict of guilt. Relying on *County Court v. Allen* (1979), 442 U.S. 140, 60 L. Ed. 2d 777, 99 S. Ct. 2213, Housby argues that the instruction undermined the fact finder's sole responsibility to find the ultimate facts and diluted the State's burden to prove the defendant guilty beyond a reasonable doubt.

Housby's objection to this instruction requires a reevaluation and updating of Illinois decisions allowing the finder of fact to infer guilt from a defendant's exclusive possession of recently stolen property when no reasonable

explanation has been advanced for the possession. Reexamination of these decisions is called for by *County Court* and *Sandstrom v. Montana* (1979), 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450, the most recent United States Supreme Court decisions dealing with the use of presumptions in criminal cases, and their antecedents, *Tot v. United States* (1943), 319 U.S. 463, 87 L. Ed. 1519, 63 S. Ct. 1241, and *Leary v. United States* (1969), 395 U.S. 6, 23 L. Ed. 2d 57, 89 S. Ct. 1532. These decisions established the following guidelines to protect against due process violations in criminal cases where presumptions are applied.

When the presumption is mandatory, that is, where the fact finder is not left free to apply or reject the inference, *County Court* applies the strictest standard and gives the defendant the most complete protection. When the fact finder is compelled to rely upon the presumption, the inferred fact must flow beyond a reasonable doubt from the established fact. 442 U.S. 140, 166, 60 L. Ed. 2d 777, 797, 99 S. Ct. 2213, 2229.

Where the inference is only permissive, that is, where the fact finder is given the option of ignoring or relying upon the inference (442 U.S. 140, 157, 60 L. Ed. 2d 777, 797, 99 S. Ct. 2213, 2224), *County Court* prescribes a less stringent standard. The test for dealing with a permissive presumption is derived from *Tot v. United States,* which required as a minimum that there be a "rational connection" between the facts proved and the facts presumed (319 U.S. 463, 467, 87 L. Ed. 1519, 1524, 63 S. Ct. 1241, 1245), and from *Leary v. United States,* which promulgated the following standard:

"[A] criminal statutory presumption must be regarded as 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact

on which it is made to depend." (395 U.S. 6, 36, 23 L. Ed. 2d 57, 82, 89 S. Ct. 1532, 1548.)

*County Court* combined the *Tot* and *Leary* tests stating: "The application of the statutory presumption in this case therefore comports with the standard laid down in *Tot v. United States* [(1943), 319 U.S. 462, 467, 87 L. Ed. 1519, 1524, 63 S. Ct. 1241, 1245], and restated in *Leary v. United States* [(1969), 395 U.S. 6, 36, 23 L. Ed. 2d 57, 81, 89 S. Ct. 1532, 1548]. For there is a 'rational connection' between the basic facts that the prosecution proved and the ultimate fact presumed, and the latter is 'more likely than not to flow from' the former. 442 U.S. 140, 165, 60 L. Ed. 777, 797, 99 S. Ct. 2213, 2229.

The *County Court* decision supplemented the application of this less stringent test for permissive inferences with the requirement that the inference be supported by corroborating evidence of guilt. (442 U.S. 140, 167, 60 L. Ed. 2d 777, 798, 99 S. Ct. 2213, 2229-30.) A permissive inference may always be rejected by the fact finder if it chooses to ignore it, and where there is corroborating evidence, the permissive inference is not the sole and sufficient basis for a finding of guilt. It is unnecessary therefore to establish that the inference follows beyond a reasonable doubt from the proved fact, for while it is necessary to prove the elements of an offense beyond a reasonable doubt, that may be done by resort to all the evidence, including the permissive inference. But, where the permissive inference stands unsupported by corroborating circumstances, the leap from the proved fact to the presumed element must satisfy the higher standard—proof beyond a reasonable doubt—for there is nothing else on which to rest the fact finder's verdict of guilt. 442 U.S. 140, 159, 167, 60 L. Ed. 777, 793, 798, 99 S. Ct. 2213, 2225-26, 2229-30.

Several Illinois decisions have dealt with the type of presumption challenged in this case. In general, they have stated that the inference arising from possession of recently stolen property without reasonable explanation is sufficient to sustain conviction in the absence of other facts and circumstances which leave a reasonable doubt of guilt in the mind of the trier of fact. (*People v. Panus* (1979), 76 Ill. 2d 263, 269-70; *People v. Stock* (1974), 56 Ill. 2d 461, 475; *People v. Taylor* (1962), 25 Ill. 2d 79, 81; *People v. Pride* (1959), 16 Ill. 2d 82, 89; *People v. Bennett* (1954), 3 Ill. 2d 357, 363; *People v. Sampson* (1929), 337 Ill. 643, 650; *Williams v. People* (1902), 196 Ill. 173, 178; *Smith v. People* (1885), 115 Ill. 17, 21.) These decisions preceded *County Court* and did not consider the principles announced in that opinion or in *Leary* or *Tot* to safeguard against due process violations when presumptions are relied upon. In only one opinion, *People v. Whittaker* (1970), 45 Ill. 2d 491, has this court referred to the *Tot* "rational connection" test or the *Leary* "more likely than not" test. But in *Whittaker* the court offered no explanation as to how the tests were satisfied. Moreover, the objection interposed to the instruction in *Whittaker* was on self-incrimination rather than due process grounds. 45 Ill. 2d 491, 497.

The Illinois rule that the recent and exclusive possession of items stolen in a burglary, without reasonable explanation, gives rise to an inference that the possession was obtained by burglary has been justified by the "inherently strong probability" that the inference is accurate. (45 Ill. 2d 491, 497.) The inference has been used by Illinois courts to prove the burglar's identity and the intent to commit a felony or theft. (*People v. Panus* (1979), 76 Ill. 2d 263, 270.) Yet, while there may be a strong probability that the inference is accurate, this does not mean it is "more likely than not" true that the possessor of the property is the burglar. Although the inference has a long

history of use in this State going back to at least 1885 (*Smith v. People* (1885), 115 Ill. 17), no court opinion has yet pointed out why it is more likely that the possessor is the burglar instead of one who received stolen property or simply joined the burglar after the crime had been committed. In *Smith,* for example, the court simply said:

> "The same person that committed the larceny *no doubt* committed the burglary \*\*\*." (Emphasis added.) (115 Ill. 17, 21.)

Expressions of certainty or long historical practice are not acceptable substitutes for reasoned explanations of why the presumed fact more likely than not flows from the proved fact. (See *Barnes v. United States* (1973), 412 U.S. 837, 843-44, 37 L. Ed. 2d 380, 386-87, 93 S. Ct. 2357, 2362.) The analysis provided by past Illinois decisions clearly does not satisfy the *County Court* test.

To the extent that past Illinois decisions have held that exclusive and unexplained possession of recently stolen property is sufficient, standing alone and without corroborating evidence of guilt, for conviction of burglary, those decisions, in the light of the United States Supreme Court holding in *County Court*, can no longer be applied, even when the inference is regarded as permissive. The presumption standing alone does not prove burglary beyond a reasonable doubt. The person in exclusive possession may be the burglar, to be sure, but he might also be a receiver of stolen property, guilty of theft but not burglary, an innocent purchaser without knowledge that the item is stolen, or even an innocent victim of circumstances.

Our treatment of previous Illinois decisions on this subject is mandated by due process requirements and is consistent with the law of other jurisdictions. Many other States apply a similar presumption only in conjunction with other facts and circumstances which corroborate the

defendant's guilt. See *State v. Pepperling* (1974), 166 Mont. 293, 533 P.2d 283; *State v. Lewis* (Iowa 1976), 242 N.W.2d 711; *State v. Searle* (La. 1976), 339 So. 2d 1194; *Gann v. State* (1971), 256 Ind. 429, 269 N.E.2d 381; *People v. Porter* (1977), 56 App. Div. 2d 583, 391 N.Y.S.2d 1002; *Commonwealth v. Simmons* (1975), 233 Pa. Super. 547, 336 A.2d 624; *People v. Rankin* (1974), 52 Mich. App. 130, 216 N.W.2d 620; *People v. Robinson* (1974), 41 Cal. App. 3d 658, 116 Cal. Rptr. 455; *Williams v. Commonwealth* (1952), 193 Va. 764, 71 S.E.2d 73; *Rayla v. Commonwealth* (Ky App. 1973), 495 S.W.2d 506; *State v. Cook* (1972), 187 Neb. 788, 194 N.W.2d 218; *State v. Heim* (1971), 83 N.M. 260, 490 P.2d 1233; *State v. Brookshire* (1971), 107 Ariz. 21, 480 P.2d 985; *Jones v. State* (Okla. Crim. App. 1970), 468 P.2d 805; *State v. Kirkman* (1967), 20 Utah 2d 44, 432 P.2d 638.

But if the presumption may not be used alone, may it still be used in conjunction with other circumstantial evidence of guilt provided it is a permissive presumption which leaves the fact finder free, as *County Court* put it (442 U.S. 140, 157, 60 L. Ed. 2d 777, 792, 99 S. Ct. 2213, 2224), to accept or reject the inference? Applying the analysis set forth in *County Court,* the inference used here did not infringe upon Housby's due process rights if: (i) there was a rational connection between his recent possession of property stolen in the burglary and his participation in the burglary; (ii) his guilt of burglary is more likely than not to flow from his recent, unexplained and exclusive possession of burglary proceeds; and (iii) there was evidence corroborating Housby's guilt.

In determining whether presumptions comported with due process in *Leary* as well as in *Turner v. United States* (1970), 396 U.S. 398, 24 L. Ed. 2d 610, 90 S. Ct. 642, statutory presumptions were examined in the light of empirical evidence relating to their accuracy. In *Barnes,* where no such evidence was presented, the court eschewed

empirical data and looked only to "common sense and experience" as demonstrating the accuracy of the presumption. (412 U.S. 837, 845, 37 L. Ed. 2d 380, 387, 93 S. Ct. 2357, 2363.) In *County Court,* where again empirical data was not presented, the court examined the corroborating evidence for the presumption's accuracy in general. (442 U.S. 140, 163, 60 L. Ed. 2d 777, 795-96, 99 S. Ct. 2213, 2227-27.) No empirical evidence of the accuracy of the presumption relied on in this case has been presented. Based on an examination of the instruction and nothing more, it is not possible to conclude that it is more likely than not true that Housby was the burglar. Viewing the instruction from the perspective of the other evidence in the case, however, we can say that it is more likely than not that Housby was a participant in the burglary.

The evidence against Housby with respect to burglary is entirely circumstantial. He was observed in possession of recently stolen property in the course of an intense police surveillance on the evening of May 20, 1977. He was first seen between 10:15 p.m. and 10:30 p.m. by police who were staking out the home of Clifford Evelhoch in Spring Valley. When he first came to the attention of the police, Housby was a passenger in a pickup truck driven by Raymond King which stopped at Evelhoch's home. Housby and King took a vacuum cleaner and clock radio out of the truck and into the house, and Evelhoch's wife began to use the vacuum. These items had been stolen in a burglary at the farm of Wilbur Heister in Tonica earlier that evening. The burglary occurred between 7 p.m. when Heister left the farm and the time Housby and King were seen with Heister's property, although Heister did not discover the burglary until he returned to his farm at about 10:30 p.m. Heister testified to the fact of the burglary and identified the items that were taken. These facts are sufficient to establish a rational connection between Housby's possession of the stolen property and his participation

in the burglary, because the inference that Housby obtained the items by burglarizing Heister's farm is not unreasonable.

But applying the additional test derived from *Leary* that the presumed fact be more likely than not to flow from the proved fact is not as simple; it requires further examination of the evidence. When King and Housby reached Evelhoch's house King asked Evelhoch to help him move a mower and Evelhoch agreed. King then went into a bedroom in the Evelhoch home to make a telephone call, and approximately 30 minutes after they arrived King and Housby, accompanied by Evelhoch and Douglas Eubanks, who was at the Evelhoch home when King and Housby got there, drove in King's pickup to Housby's home in Peru. Housby then got into a panel truck standing in the yard. Housby, driving the panel truck, followed King, in the pickup, to a rural wooded area outside of Peru known as Bailey Falls, which was reached by a dirt road. There, other proceeds of the burglary, including a John Deere riding lawnmower, were hidden among the trees. Leaving the other items in the woods, King, Housby, Evelhoch, and Eubanks loaded the mower onto the panel truck, and proceeded in the two vehicles to the farm of Leroy Koch, where they unloaded the mower. During their stop at the Koch farm, King was the only one who conversed with Koch. Koch gave King a check for $500, payable to the Green Front Tavern, which was owned by James Wasilewski.

Koch testified under an immunity grant that a few days before the delivery he had asked Wasilewski to get him such a mower at a good price. On the night of the delivery Wasilewski called him twice. The first call corresponded approximately to the time that King and Housby were at Evelhoch's; the second call was a few minutes later. In the first call Wasilewski told Koch he had the mower for him, and the price would be $500. In the

second call Wasilewski told him "they" were on the way over to deliver the mower. King, Housby, Evelhoch, and Eubanks arrived at the Koch farm approximately 1½ hours later.

After leaving Koch's place, Housby and Evelhoch returned to the latter's house in the panel truck. King and Eubanks drove in the pickup truck to the Green Front Tavern, and King gave Koch's check to Wasilewski. King and Eubanks then returned to Evelhoch's, arriving there at approximately 1:45 a.m. At approximately 2 a.m., Housby and King both left Evelhoch's, Housby in his panel truck and King in his pickup.

During the night, police moved into the area where the mower had been hidden and recovered the items left there which had been stolen from the Heister farm. The next morning, armed with search warrants, the police seized the mower from Koch's farm and the vacuum cleaner and clock radio from Evelhoch's house. Housby and King were arrested.

Housby took the stand to explain his association with King on the night of the burglary. He stated that King had come to his house about 10 p.m. and asked for his help in moving a mower he said he had just bought. Housby's testimony was that King showed him a receipt for a mower, a vacuum cleaner, and a clock radio, but he did not read it. The receipt was signed by a person named Bob Lewis and witnessed by four others. Though the receipt was produced by Housby at his trial, neither Lewis nor any of the witnesses were.

Housby agreed to go with King, a long-time acquaintance. They went first to Evelhoch's home. While enroute there King said he planned to sell the mower to his brother. Housby replied that if King's brother did not buy the machine because he was going out of business, then King's yard was not big enough for such a machine. Housby suggested that King sell it to Wasilewski, saying that he

had heard that Wasilewski was in the market for a mower. After leaving Evelhoch's, King told Housby he had called Wasilewski, but Housby did not overhear this conversation.

Housby testified that he suggested they use the panel truck, which was old and beat up, instead of King's new pickup. Housby explained that he did not think the four men (King, Housby, Evelhoch, and Eubanks) would fit comfortably in the pickup, and he was afraid that King's new pickup would be scratched.

Housby testified he did not ask King how big the mower was or whether it would fit in the panel truck. Housby's testimony on this subject was as follows:

"Q. Had King given you any measurements as to how big this riding lawn mower was to know it would fit in the panel truck?

A. No.

Q. Did you know if it would fit in the panel truck when you went to Bailey Falls?

A. I just assumed that it would.

Q. You didn't take any measurements?

A. No.

Q. Did you ask Raymond King how big the lawn mower was?

A. No.

Q. Did you ask him what the size was to make sure this particular model would fit in the panel truck?

A. No.

Q. You just took the panel truck to Bailey Falls and hoped the mower would fit, is that correct?

A. Yes, sir."

Housby did not state at any point in his testimony that he knew how big a John Deere riding lawnmower was or that it would fit into the panel truck.

Housby was in joint possession of the proceeds of the burglary with King less than three hours after the offense. Housby claimed that at the time of the break-in he was at home with his wife and brother-in-law, each of whom testi-

fied and confirmed his account, but the jury was free to disbelieve this explanation.

The following circumstances in evidence, taken together, establish that it is more likely than not that Housby obtained possession of the recently stolen property by burglary. Housby was the one to suggest that Wasilewski be contacted to try to dispose of the mower. Koch, in a call to Wasilewski a few days earlier, told him of his interest in that type of mower. It appears more likely that Heister's farm was burglarized to supply a mower for Koch than that the burglary took place without any prearrangements for disposition of the mower. For the latter to be true requires belief in the following series of coincidences: that King picked up Housby at 10 p.m. without appointment or prearrangement to help him move the mower; that Housby suggested that King dispose of the mower by calling Wasilewski because he happened to know that Wasilewski was looking for a mower; and that Wasilewski happened to be in the market for a mower for Koch and, as a result of Housby's gratuitous suggestion, the mower was delivered to Koch within 2½ hours of the time King stopped to solicit Housby's aid and within 5½ hours of the burglary.

To move the mower, Housby supplied a panel truck which did not belong to him. Such free and easy use of another's truck is unusual, especially because the questionable circumstances of the transfer must have raised doubts in Housby's mind as to how King himself came into possession. In addition, the testimony indicates that, when Housby stopped at his house on the way to Bailey Falls, he did not have to go into his house to get the keys for the panel truck. This suggests that he had anticipated the use of the panel truck to move the stolen merchandise.

The panel truck was big enough to carry the mower. This suggests that Housby had previously seen the mower. The truck was enclosed and shielded the mower from pub-

lic view while it was transported to Koch. Housby claimed he was not offered money to help King or even to pay for the panel truck's gas. After the delivery to Koch, Housby stopped for gas and had to borrow $2 from Evelhoch to pay for it. The post-delivery meeting at Evelhoch's offered King an opportunity to share with Housby whatever King might have received from Wasilewski for the mower.

These circumstances make it unlikely that Housby was an innocent victim of circumstances. It is also unlikely that he merely joined King after the burglary to dispose of the proceeds. King made the contact with Wasilewski, and Wasilewski arranged for the sale to Koch. At Koch's, it was again King in charge of the deal, receiving the check and delivering it to Wasilewski. Housby did not perform any of the functions normally expected of a "fence," and it was unlikely that he was acting in that capacity.

For these reasons we conclude that Housby's involvement with the stolen property and his conduct with respect thereto indicate that it is more likely than not that he obtained his possession by burglary.

The corroborating circumstances which supported the inference that Housby participated in the burglary also satisfy the *County Court* requirement that the presumption not be the only basis for the finding of guilt. The corroborating evidence in this case may be found not only in the circumstances already discussed, but also in additional evidence indicating that Housby's possession of the stolen property was not honest. The fact that the mower was concealed in a remote wooded area is evidence of the lack of honesty in Housby's possession, as is the delivery of the mower to Koch for consideration payable to Wasilewski within such a short time after it was taken from the Heister farm. Sufficient corroboration is also presented where the defendant himself presents an explanation of possession that the jury reasonably finds to be

false. Housby's attempt to explain his possession of the stolen property in a way which showed him innocent of any wrongdoing could justifiably have damaged him in the eyes of the jury.

Housby argues that the presumption of guilt based on the exclusive and unexplained possession of recently stolen property shifts the burden of persuasion because the Illinois rule, announced in *People v. Stock* (1974), 56 Ill. 2d 461, is that the mere fact that a defendant makes an explanation is not enough to defeat the inference. Such a shift would mean that the presumption is mandatory and would have to meet the beyond-a-reasonable-doubt test. But the inference arising from possession of recently stolen property is a permissive one and shifts only the burden of production, not the burden of proof. (*People v. Bennett* (1954), 3 Ill. 2d 357, 364.) The burden of production shifts to the defendant only if the jury decides to accept the move from the proved fact to the presumed element. (*People v. Hanson* (1968), 97 Ill. App. 2d 338, 342.) At that point, the burden on the defendant to produce a reasonable explanation of possession is no more onerous than the normal consequence of any evidence introduced by the State tending to show guilt. The defendant must neutralize the State's case in the eyes of the jurors or suffer a conviction. The constitutional dangers of presumptions used in criminal cases—that they will deprive the jury of its right to an independent evaluation of the evidence or relieve the State of its duty to prove every element of the offense beyond a reasonable doubt (442 U.S. 140, 157, 60 L. Ed. 2d 777, 792, 99 S. Ct. 2213, 2224)—are simply not presented by the inference used in this case.

Finally, the defendant contends that even if the use of the presumption were justified here, the instruction explaining it to the jury was deficient. Housby argues that the instruction was worded in such a way as to compel the jurors to treat the presumption as mandatory and conclu-

sive. He suggests that the jurors interpreted the instruction as giving them no option, but as requiring them to find the defendant guilty so long as Housby's possession of recently stolen property was unexplained and exclusive. Even if the jurors understood the instruction as merely shifting the burden of production, Housby points out that the instruction did not tell the jurors how much proof was needed to rebut it.

In *Sandstrom v. Montana* (1979), 442 U.S. 510, 513, 61 L. Ed. 2d 39, 44, 99 S. Ct. 2450, 2453, an instruction that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts" was struck down as mandating a conclusive presumption on the issue of intent. The court said that a reasonable juror could well have interpreted the instruction as an irrebuttable direction to find intent once convinced of the facts triggering the instruction, or as a direction that the defendant bore the burden of proof on the issue of intent. Either interpretation resulted in an unconstitutional presumption. The jurors were deprived of their right to independently evaluate the evidence, and the State was relieved of its duty to prove every element of the offense beyond a reasonable doubt. 442 U.S. 510, 524, 61 L. Ed. 2d 39, 51, 99 S. Ct. 2450, 2459.

The court rejected the *Sandstrom* instruction, noting two features. First, the instruction failed to inform the jurors that they had the choice of applying the presumption or rejecting it. Second, the jurors were told, "The law presumes," instead of "You may presume." (442 U.S. 510, 515, 61 L. Ed. 2d 39, 45, 99 S. Ct. 2450, 2454.) The court concluded that these elements of the instruction made it mandatory, not permissive, in the eyes of the reasonable juror. The second objectionable feature of the *Sandstrom* instruction is not a factor here. The instruction in this case states that the jurors "may infer." These same words address the first feature by informing the jurors that

they had the option of ignoring the instruction. The instruction in this case did not explicitly tell the jurors that they were free to choose whether to credit or reject the presumption. But the words "you may infer" were adequate to advise them that the inference with which they were dealing was permissive, and that they were free to decide whether to make use of it in judging Housby's guilt. Similar language ("you may infer") made the instruction struck down in *Sandstrom* valid when later challenged before the Montana Supreme Court. *State v. Coleman* (1979), ——— Mont. ———, ———, 605 P.2d 1000, 1052.

The defendant claims that the instruction would have been better had it explicitly told the jurors that they could disregard the presumption. He points out that a proposed revision of IPI Criminal No. 13.21 includes a sentence stating that the jury is never required to make the inference. The instruction could, of course, have been in more detail and could have expressly told the jury that it was free to credit or reject the inference suggested to it. Other States have added such explanations to similar instructions. (See *State v. Lewis* (Iowa 1976), 242 N.W.2d 711; *Wells v. People* (1979), 197 Colo. 350, 592 P.2d 1321.) Still, the lack of a more complete explanation is not a controlling consideration in determining the validity of the instruction. (*State v. Rinehart* (Iowa 1979), 283 N.W.2d 319, 323.) Such an addition to IPI Criminal No. 13.21, although perhaps prudent, would be redundant, because the instruction, as given, advised the jurors that they "may infer."

Apart from the wording of the instruction here, the other instructions given to the jury also told the jurors that it was they who would make the final decision on whether to apply the presumption. When examining instructions in a case, no single instruction is to be judged in artificial isolation. It must be viewed in the context of

the entire charge. (*Cupp v. Naughten* (1973), 414 U.S. 141, 146-47, 38 L. Ed. 2d 368, 373, 94 S. Ct. 396, 400; *McInerney v. Berman* (1st Cir. 1980), 621 F.2d 20, 23-24; *People v. Mills* (1968), 40 Ill. 2d 4, 15.) Housby's jury was given, in addition to the instruction at issue, the following: IPI Criminal No. 1.01, which told the jurors that they were not to single out particular instructions, that they were to act as the judges of the facts, and that they should consider all the evidence in light of their own observations and experience; IPI Criminal No. 2.03, which states that the defendant has the presumption of innocence at every stage in the trial, that the presumption of innocence is not overcome except by proof beyond a reasonable doubt, and that the burden of proof beyond a reasonable doubt remained on the State throughout the trial; the burglary elements instruction, IPI Criminal No. 14.06, which requires an acquittal if any element is not proved beyond a reasonable doubt; and most importantly, IPI Criminal No. 3.02 on circumstantial evidence, including the warning that the jurors were not to find the defendant guilty unless the circumstantial evidence excluded every reasonable theory of innocence. This latter instruction was especially important, because it told the jury that if it had any reasonable doubt about relying upon the inference, which was only circumstantial in nature, it should find Housby not guilty. Unlike *Sandstrom,* the remaining instructions in the charge, when taken together with the permissive wording of the instruction objected to, adequately informed the jury that it had the option of disregarding the presumption if it so chose. Compare *Sandstrom,* 442 U.S. 510, 518 n.7, 61 L. Ed. 2d 39, 47 n.7, 99 S. Ct. 2450, 2456 n.7.

In addition, the jury was given IPI Criminal No. 1.02, which told it that it was the sole judge of credibility. Thus, the jurors knew that the defendant's possession would remain unexplained, his burden of production

unfulfilled, and the presumption unrebutted unless they believed the witnesses brought forth or the argument set out to explain Housby's possession. The jury was therefore adequately informed of the degree of proof needed to rebut the permissive inference, and the wording of IPI Criminal No. 13.21, when considered along with the rest of the charge, did not violate the defendant's right to due process.

The presumption and the instruction explaining it to the jury were not used improperly in this case. The defendant's conviction must be affirmed.

The defendant argued that the mittimus did not reflect the intention of the trial judge, because the stated sentence—seven years—exceeds the maximum for theft. The appellate court ordered the cause remanded to permit the trial court to clarify its sentencing intention. We agree with that resolution of the problem and remand the cause for sentence clarification.

*Affirmed and remanded,*
*with directions.*

MR. JUSTICE RYAN took no part in the consideration or decision of this case.