869 N.E.2d 883 (2007)
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Paul Victor McGEE, Defendant-Appellant.
No. 1-05-3020.
Appellate Court of Illinois, First District, First Division.
May 21, 2007.
Rehearing Denied June 25, 2007.
*885 Office of the State Appellate Defender, Chicago (Shobha L. Mahadev, of counsel), for Appellant.
State's Attorney, Cook County, Chicago (James E. Fitzgerald, John E. Nowak, Liam F. Reardon, of counsel), for Appellee.
Justice ROBERT E. GORDON delivered the opinion of the court:
Following a jury trial, defendant Paul McGee was found guilty of burglary and sentenced to a term of 15 years' imprisonment as a Class X offender. On appeal, defendant argues that (1) the trial court erred by denying his motion to quash arrest and suppress evidence due to a lack of probable cause; (2) the State failed to prove him guilty beyond a reasonable doubt, where purportedly the only evidence against him was his possession of the proceed from the burglary; and (3) trial counsel was ineffective by (a) failing *886 to raise objections to Illinois Pattern Jury Instructions, Criminal No. 3.15(b)(4th ed.2000)(hereinafter IPI Criminal (4th No. 3.15)), (b) failing to object to the admission of the victim's identification testimony, and (c) failing to object to testimony identifying the defendant in a police show up procedure.

BACKGROUND
Prior to trial, defendant moved to quash his arrest and suppress evidence, specifically a Palm Pilot portable computer that was seized from his person during a custodial search following his arrest. Defendant argued that the police officers lacked probable cause to make an arrest. At the hearing, Officers Lance Lopez and George Gonzalez, as well as the victim, Darren Taylor, testified. Officer Lopez testified that on April 24, 2003, at 10:15 p.m., he was on duty in Evanston Township and was notified over the police radio that there was a burglary of an automobile in progress in the 1200 block of Wesley Avenue. He was also informed that Taylor was in pursuit of the possible offender, described as a male subject wearing dark clothes and carrying a white bag. Officer Lopez testified that he headed to the scene of the burglary but was redirected by the dispatcher to a location three blocks north of the 1500 block of Wesley. Upon arriving at that location, Officer Lopez spotted a suspect who matched the description provided over the police radio. The suspect was wearing dark clothes consisting of a corduroy jacket and a "do-rag" (a simple piece of cloth tied at the back, used to cover the head) and carrying a white bag. Officer Lopez was also informed that Taylor, who had been following the suspect, was nearby. Officer Lopez was under the impression that Taylor was an occurrence witness and had been following the suspect from the scene of the burglary.
Officer Lopez approached defendant and shined a light on his face in order to allow Taylor the opportunity to clearly view and identify the suspect. Taylor made a positive identification of the suspect while sitting in his automobile from 75 feet away. Defendant was placed under arrest, and Officer Lopez performed a custodial search of defendant's person and found he was in possession of a Palm Pilot taken from Taylor's vehicle. Officer Lopez never brought defendant to Taylor or asked Taylor to get out of his automobile to identify him.
Taylor testified that on the night of April 24, 2003, at approximately 10:10 p.m. he was in bed with his wife at his home at 1245 Wesley Avenue in Evanston, when he heard a crash and his auto alarm go off. His wife went to the bedroom window, while he grabbed his cell phone and his wife's car keys and ran outside. While he was outside, his neighbor Margaret Froh "Peggy" Asseo ran toward him. His wife as well as Asseo yelled that they saw a man running north on Wesley wearing a dark parka, tight hat, and carrying a white bag. Taylor looked into the front seat of his Ford Explorer and saw that his briefcase was missing from the front passenger seat. The only thing of value in his briefcase was his Palm Pilot. Taylor took his wife's car and headed north on Wesley, crossing Dempster Street, and turned into the alley north of Dempster when he saw a man wearing a dark coat, tight hat and carrying a white bag. Taylor then called his wife to obtain a further description of the man she had seen. She told him that the man had a dark coat, tight hat, and white bag. He did not see anyone else in the area matching this description. Defendant was not carrying a brief case. Taylor then called 911 and provided a description of defendant and his location. An officer arrived, approached defendant, and shined a light on defendant's face. Taylor gave a "thumbs up" from his wife's *887 auto approximately 75 feet from the suspect. Defendant was arrested. A custodial search revealed that a Palm Pilot was on defendant's person.
After the search an officer approached Taylor with the Palm Pilot, which Taylor positively identified as his Palm Pilot taken from his vehicle.
On cross-examination, Taylor testified that while pursuing the suspect, he lost sight of him and thought that he may have gone into a vehicle. Taylor told the dispatch that he was not sure that he was following the right person, but his wife had seen a man with a ski hat and the neighbor had seen someone carrying a white bag. This information was never transmitted to the police on the scene because at that point the defendant had already been stopped by the police. However, on redirect examination, Taylor confirmed that the suspect arrested was the same person he had been following.
Officer George Gonzalez's testimony corroborated Officer Lopez's testimony regarding the arrest of defendant and the identification by Taylor. The trial court was presented with the tape recordings of all 911 calls and radio communications between the police. The 911 tape and transcript were admitted into evidence by stipulation that the tape contained two separate channels running simultaneously, but dubbed sequentially. Consequently, the arresting officer may not have been privy to the 911 call from Taylor to dispatch. The trial court also noted that some sections of the transcript of the radio communications were missing and out of order. The 911 tape consisted of phone calls made by Taylor's wife, as well as Taylor. Immediately after the burglary occurred, Mrs. Taylor called 911 and, based in part on Ms. Asseo's description, described the suspect of the burglary as wearing a parka, being 5 feet 10 inches tall and slender, and carrying a white bag. Mrs. Taylor could not identify the race of the suspect. Taylor also called 911 while in pursuit of defendant and informed the dispatch on several occasions that he was unsure if he was following the person who had broken into his vehicle, but he had been following the person his wife saw near his vehicle at the time of the break in. Officer Lopez additionally testified that certain car-to-car communications between the police officers were not on the tape recordings. Upon hearing the testimony and reviewing the transcripts of the 911 calls and radio communications, the judge denied defendant's motions to quash the arrest and suppress the evidence seized during the custodial search.
At the conclusion of the suppression hearing, the trial judge noted, "It's clear to me the police were never told that Darren [Taylor] wasn't an occurrence witness to this case." The trial judge held the description provided to the police officers was sufficient to stop defendant. Specifically, the trial court distinguished the present case from People v. Lawson, 298 Ill.App.3d 997, 233 Ill.Dec. 24, 700 N.E.2d 125 (1998), a case which affirmed a quashing of an arrest and suppression of evidence where the officer issuing the police bulletin did not possess facts sufficient to establish probable cause. However, in this case, the trial court held that the dispatch issuing the bulletin relied on the description provided by Mrs. Taylor as well as Darren Taylor, and the arresting officer also relied on the fact that Darren Taylor had followed defendant and was near the scene of the arrest. Additionally, the trial court held that there was no other person in the area and the suspect was stopped three blocks from the burglary 5 to 10 minutes after the break-in. The trial court concluded that the officers made a valid Terry stop. Terry v. Ohio, 392 U.S. *888 1, 31, 88 S.Ct. 1868, 1885, 20 L.Ed.2d 889, 911 (1968).
After the identification by Taylor's "thumbs up," the trial court held that "[a]t that point it is clear to me they had a full blown probable cause to arrest him." The trial court relied on People v. Hubbard, 341 Ill.App.3d 911, 916, 275 Ill.Dec. 932, 793 N.E.2d 703 (2003), which held that time and proximity to the commission of the crime are major factors to consider in deciding whether one can make a stop. The trial court also held that the transcript of the radio communications was complete enough to draw a conclusion that there was probable cause to believe that a crime had been committed and that this defendant, who was stopped within close temporal and geographical proximity, fitting the same general description, committed that crime.
The case then proceeded to a jury trial. At trial, Mrs. Taylor testified that at 10:15 p.m. on April 24, 2003, she and her husband were in bed watching television when she heard a loud smashing sound and then the sound of her husband's auto alarm being activated. She looked out of the bedroom window and saw that the passenger side window of her husband's Ford Explorer had been broken. She saw a man walking away from the Explorer, and described him as a man wearing a dark jacket and a tight dark hat and carrying a white bag. He headed northbound. Mrs. Taylor did not see or hear any vehicles speeding away. She dialed 911 and her husband grabbed his cell phone, her car keys, and proceeded outside. From the bedroom window she yelled the description of the man she saw. On cross-examination, Mrs. Taylor testified that she did not see the man's left hand or if he was carrying a briefcase.
Peggy Asseo, a neighbor of the Taylors, testified that at the time of the incident she was in her home and heard a popping noise that sounded like a car window breaking and within seconds looked out her window. She testified that a man walked into her line of sight, stopped slightly north of the Explorer, pulled something down over his head, and shook a satchel in his hand. She stated that the man was wearing a dark parka or coat and wore something on his head. She ran downstairs and gave her husband the description of the man and his direction of travel. She stated that the man was medium height, about 5 feet 10 inches tall, not overweight with broad shoulders.
At trial, Taylor's testimony was consistent with his testimony given at the motion to quash arrest and suppress evidence hearing. At trial, Taylor also explained in detail his pursuit of defendant from his home until he was apprehended. He explained to the court how he retracted his steps with the police officers after defendant's arrest and found his briefcase in a garbage can. Taylor made an in-court identification of the suspect, positively identifying defendant as the individual he had followed from his home and identified in the alley at the time of defendant's arrest. Taylor explained how he identified defendant during the showup procedure and that an officer came and asked him if the suspect was the person he had been following. Taylor again explained that while following the suspect from his home, he was unsure if the suspect he was following was the individual that had broken into his vehicle, but that he was sure that the person he was following was the person his wife had described.
Officer Lopez's testimony also reflected his testimony at the suppression hearing. On cross-examination, he acknowledged that he did not conduct a lineup and that he did not order a fingerprint work up from the Palm Pilot and that no prints *889 could be lifted off the briefcase. He also agreed that he would not describe defendant's coat at the time of arrest as a "parka," as previous testimony from Ms. Asseo reflected. Officer Lopez also testified that defendant was 6 feet 2 inches and weighed 200 pounds.
The defense called one witness, Ralph Metz, an investigator from the Cook County Public Defender's office. Metz testified that he contacted Asseo over the phone and that she described the suspect as 5 feet 9 inches, wearing a dark, hooded sweatshirt that was pulled tightly around his head. Metz stated that Asseo told him that she would not be able to identify the person she saw on the night of the burglary. Metz also stated that he interviewed Mrs. Taylor over the phone. The defense also offered into evidence the 911 tape, which was played for the jury. The defense then rested.
The jury received various instructions, including IPI Criminal 4th No. 3.15 regarding eyewitness testimony. After being instructed, the jury found defendant guilty of burglary. Following the trial, defense counsel as well as defendant pro se, filed motions for a new trial. Defendant argued that his counsel was ineffective. The court appointed a new attorney to represent him in that claim. At the hearing, defendant claimed to be dissatisfied with his new representation and requested the court to consider his pro se motion instead of his counsel's motion for a new trial. The trial court ruled that it would consider both defendant's and his counsel's motions. After a hearing in which defendant testified, the court denied the motion for a new trial. Defendant was ultimately sentenced to 15 years in prison pursuant to the Class X sentencing statute.

ANALYSIS

I. Motion to Quash Arrest and Suppress Evidence
On appeal, defendant first argues that the trial court erred by denying his motion to quash his arrest and suppress evidence. Defendant contends that the information available to the police officers did not support a finding of probable cause to warrant his arrest. Generally, a trial court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous; however, when neither facts nor the credibility of the witness is contested, the trial court's ruling will be reviewed de novo. People v. Bunch, 207 Ill.2d 7, 13, 277 Ill.Dec. 658, 796 N.E.2d 1024 (2003). Both the State and defendant submit that the question here is legal in nature and therefore a de novo review applies.
An arrest without a warrant is valid only if supported by probable cause. People v. Montgomery, 112 Ill.2d 517, 525, 98 Ill.Dec. 353, 494 N.E.2d 475 (1986). The Illinois Supreme Court has stated:
"Probable cause exists when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. [Citations.] Whether probable cause is present is governed by common-sense considerations [citations], and the calculation concerns `[t]he probability of criminal activity, rather than proof beyond a reasonable doubt.'" Montgomery, 112 Ill.2d at 525, 98 Ill.Dec. 353, 494 N.E.2d 475, quoting People v. Tisler, 103 Ill.2d 226, 236, 82 Ill.Dec. 613, 469 N.E.2d 147 (1984).
The United States Supreme Court has set the standard for the reviewing courts in determining probable cause. In order to access whether an officer had *890 probable cause to arrest an individual, the reviewing court must examine "the events leading up to the arrest, and then decide `whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 800, 157 L.Ed.2d 769, 775 (2003), quoting Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 1661-62, 134 L.Ed.2d 911, 919 (1996).
In this case, the trial judge, upon hearing testimony from Officers Lopez and Gonzalez and Taylor, and after reviewing the radio communications and 911 transcript in light of the applicable law, appropriately concluded that the police officers had probable cause to arrest and search defendant. Officer Lopez testified that he received a call from dispatch identifying the suspect as a male wearing dark clothes and carrying a white bag. Officer Lopez was informed that the victim of the burglary was pursuing the suspect, and the police dispatch directed Officer Lopez to a location three blocks north of the scene of the burglary. Upon arriving at the location, Officer Lopez spotted the suspect, who matched the description provided to him. Officer Lopez did not see any other individuals in the area matching the description. He conducted a show up and the suspect was positively identified by Taylor, albeit from a distance of approximately 75 feet. Officer Lopez testified that he thought that Taylor witnessed the suspect break into his vehicle.
Given these historical facts, it would be reasonable for Officer Lopez to conclude that he had probable cause to arrest the suspect. In People v. Follins, 196 Ill. App.3d 680, 684, 143 Ill.Dec. 410, 554 N.E.2d 345 (1990), this court found that probable cause existed when an arresting officer testified at a pretrial hearing on a motion to quash arrest that he stopped defendant because he matched a radio broadcast of a general description (black male offender, 5 feet 9 inches tall, weighing 170 pounds, wearing a blue sweat suit). In Follins, the officer stopped the defendant within minutes after a robbery only a few blocks from the scene of the crime as defendant was walking away from the scene. Follins, 196 Ill.App.3d at 692, 143 Ill.Dec. 410, 554 N.E.2d 345. Likewise in this case, defendant matched a general description as provided to the police officers by the victim and was the only person in the area that matched that description. Taylor was following the suspect, had made a call to 911, and directed the police officers to the exact location. The trial court appropriately took into consideration the time and proximity of the commission of the crime to the scene of the arrest. The arrest was made within 5 to 10 minutes after the commission of the crime, which occurred and only three blocks from the burglary. Based on the totality of the facts and circumstances known to the officers, it is more than reasonable to conclude that the officers had probable cause to arrest defendant.
Defendant contends that no probable cause existed at the time of his arrest because Taylor told the dispatcher that he was unsure if the person he was following was the person who had broken into his vehicle. Although Taylor may have expressed doubts to the dispatcher, probable cause is determined based on the reasonableness of the police officers actions in light of the facts and circumstances presented to them. The officers were directed to a location by the dispatcher and spotted a suspect matching the description provided to them. Once the suspect was stopped, and then identified by Taylor, the officers had probable cause to arrest and search defendant.
*891 Accordingly, the trial court properly held that there was probable cause to make a valid arrest. Follins, 196 Ill. App.3d at 684, 143 Ill.Dec. 410, 554 N.E.2d 345. Consequently, the Palm Pilot recovered from defendant's person was not the fruit of an unlawful arrest and therefore should not have been barred as evidence at trial.

II. Sufficiency of the Evidence
Next, defendant challenges the sufficiency of the evidence of his burglary conviction. "When a defendant challenges the sufficiency of the evidence, this court must determine whether a rational trier of fact, after viewing the evidence in the light most favorable to the State, could have found the elements of the offense proven beyond a reasonable doubt." People v. Natal, 368 Ill.App.3d 262, 268, 306 Ill.Dec. 865, 858 N.E.2d 923 (2006), citing People v. Maggette, 195 Ill.2d 336, 353, 254 Ill.Dec. 299, 747 N.E.2d 339 (2001). A court will not set aside "a criminal conviction on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of defendant's guilt." Maggette, 195 Ill.2d at 353, 254 Ill.Dec. 299, 747 N.E.2d 339.
To obtain a conviction for burglary here, the State must prove that defendant knowingly entered the motor vehicle with the intent to commit a felony or theft. 720 ILCS 5/19-1 (West 2004). Circumstantial evidence is sufficient to sustain a conviction of burglary, so long as the elements of the crime have been proven beyond a reasonable doubt. See People v. Hall, 194 Ill.2d 305, 330, 252 Ill.Dec. 653, 743 N.E.2d 521 (2000); People v. Gilliam, 172 Ill.2d 484, 515, 218 Ill.Dec. 884, 670 N.E.2d 606 (1996). However, as the Illinois Supreme Court addressed in People v. Housby, 84 Ill.2d 415, 423, 50 Ill.Dec. 834, 420 N.E.2d 151 (1981), a defendant's possession of recently stolen property, standing alone, is not sufficient evidence to sustain a burglary conviction. In this case, defendant asserts that the court's decision in Housby should govern. Unlike Housby though, in the present case, the State presented a sufficient amount of evidence beyond mere possession of a stolen good for a reasonable trier of fact to find defendant guilty of burglary.
At trial, Mrs. Taylor testified that she heard her husband's auto alarm go off, went to the bedroom window, and saw a male individual with a dark jacket and tight dark hat carrying a white bag walking north from her husband's Explorer. Ms. Asseo, a neighbor, also heard the alarm and looked out her window and saw a man wearing a dark parka or coat and something on his head. Darren Taylor ran outside, obtained the man's description and his direction of travel from his wife and their neighbor, and then used his wife's auto to drive north a few blocks when he spotted an individual who fit the description. He then called his wife, who confirmed the description. Taylor then called the police to describe the location of defendant. When the police arrived, Officer Lopez approached defendant and shined a light in defendant's face, and Taylor identified the person with a "thumbs up" from 75 feet away. The defendant was then arrested and searched. The custodial search revealed a palm pilot, which Taylor identified as his palm pilot which was located in his briefcase and taken from his vehicle. The location of arrest was approximately three blocks from the commission of the burglary and within a short period of time after the commission of the crime. Additionally, Taylor with the aid of the police officers retraced the few blocks from Taylor's home to the location where he spotted defendant, and discovered Taylor's briefcase that was discarded in a garbage can. Based on this *892 evidence presented to the jury, it was reasonable to conclude that defendant committed the crime of burglary. The State presented circumstantial evidence, beyond mere possession of the stolen property, for a reasonable trier of fact to find defendant guilty of burglary.
Even if this court were persuaded by defendant's contention that the decision of Housby should govern this case, the jury verdict was nonetheless proper. In Housby, the Illinois Supreme Court held "that a jury could presume guilt based on exclusive possession of recently stolen property only if three requirements were met: (1) there was a rational connection between defendant's recent possession of stolen property and his participation in the burglary; (2) defendant's guilt of the burglary `more likely than not' flowed from his recent, unexplained and exclusive possession of the proceeds; and (3) there was corroborating evidence of defendant's guilt." Natal, 368 Ill.App.3d at 269, 306 Ill.Dec. 865, 858 N.E.2d 923, citing Housby, 84 Ill.2d at 424, 50 Ill.Dec. 834, 420 N.E.2d 151. In this case, there exists a rational connection between defendant's possession of the Palm Pilot and the closeness in time and proximity to the commission of the burglary. See, e.g., People v. Carter, 197 Ill.App.3d 1043, 1046, 145 Ill.Dec. 529, 557 N.E.2d 299 (1990) (holding that the proximity of the location and the time of arrest to the commission of the crime supports a rational connection as to satisfy the first prong of the Housby test). It is also clearly more likely than not that defendant burglarized Taylor's vehicle rather than the unexplained, innocent possession of the Palm Pilot. Finally, the State presented corroborating evidence through Mrs. Taylor and Ms. Asseo, each of whom identified the suspect as wearing a dark coat and a tight-fitting hat and carrying a white bag. Even though defendant was not wearing a "parka" as Ms. Asseo testified, the description of a dark coat and tight-fitting hat and the carrying of a white bag was sufficient corroborating evidence of defendant's guilt. Under the Housby analysis, the State has met its burden of proof.
Accordingly, the State presented sufficient evidence to prove defendant guilty beyond a reasonable doubt.

III. Ineffective Assistance of Counsel
Finally, defendant contends that he is entitled to a new trial because he received ineffective assistance of counsel. "To prevail on a claim of ineffective assistance of counsel, a defendant must show that his attorney committed such serious errors as to fall beyond an objective standard of reasonableness, and that, without those objectively unreasonable errors, there was a reasonable probability that his trial would have resulted differently." People v. Ward, 371 Ill.App.3d 382, 434, 308 Ill.Dec. 899, 862 N.E.2d 1102 (2007), citing Strickland v. Washington, 466 U.S. 668, 687-94, 104 S.Ct. 2052, 2064-68, 80 L.Ed.2d 674, 693-98 (1984); People v. Albanese, 104 Ill.2d 504, 526, 85 Ill.Dec. 441, 473 N.E.2d 1246 (1984). This is a two-prong test.
In Strickland, the United States Supreme Court delineated the two-prong test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under Strickland, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. Strickland, 466 U.S. at 687, 104 S.Ct. 2052, 2064-68, 80 L.Ed.2d 674, 693-98. Our Illinois Supreme Court has stated that to demonstrate performance deficiency, a defendant must establish that counsel's performance was below an objective standard of reasonableness. People v. Edwards, 195 Ill.2d 142, 163, 253 Ill.Dec. 678, 745 N.E.2d 1212 (2001). In evaluating sufficient *893 prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability under the Act." Fikara, 345 Ill.App.3d at 152, 280 Ill.Dec. 335, 802 N.E.2d 260. Accordingly, that order was immediately appealable and the defendant was required to file a notice of appeal within 30 days. Fikara, 345 Ill.App.3d at 152, 280 Ill.Dec. 335, 802 N.E.2d 260. The court found the defendant's failure to file a timely notice of appeal deprived it of jurisdiction. Fikara, 345 Ill.App.3d at 152, 280 Ill.Dec. 335, 802 N.E.2d 260.
However, the Fikara court supplemented its opinion upon denial of rehearing. In the supplemental opinion, the court considered the defendant's assertion that the trial court failed to order the clerk of the circuit court to provide the defendant with immediate notice of the adverse judgment as required by Supreme Court Rule 651(b) (134 Ill.2d R. 651(b)) and that this failure should excuse his untimely notice of appeal. Fikara, 345 Ill.App.3d at 157-58, 280 Ill.Dec. 335, 802 N.E.2d 260. "Supreme Court Rule 651(b) requires that, upon the entry of a judgment adverse to a defendant in a postconviction proceeding, the clerk of the trial court `shall at once mail or deliver' to the defendant a notice advising him of the entry of the order and advising him of his right to appeal." Fikara, 345 Ill.App.3d at 158, 280 Ill.Dec. 335, 802 N.E.2d 260, quoting 134 Ill.2d R. 651(b). The reviewing court reviewed the record and concluded that the clerk of the trial court failed to provide the defendant with the required notice of the adverse judgment and the trial court also failed to admonish the defendant about the finality of the order and the need to file a notice of appeal within 30 days. Fikara, 345 Ill. App.3d at 158, 280 Ill.Dec. 335, 802 N.E.2d 260.
The Second District noted that in cases where the requirements of Rule 651(b) have not been satisfied, "the reviewing court must treat a defendant's untimely notice of appeal as a petition for leave to file a late notice of appeal within the contemplation of Supreme Court Rule 606(c) (188 Ill.2d R. 606(c))." Fikara, 345 Ill. App.3d at 158, 280 Ill.Dec. 335, 802 N.E.2d 260. "The reviewing court must then grant the petition and consider the merits raised in the defendant's appeal." Fikara, 345 Ill.App.3d at 158, 280 Ill.Dec. 335, 802 N.E.2d 260. "The reviewing court must allow the filing of a late notice of appeal even when the six-month period for seeking leave to file a late notice of appeal provided in Rule 606(c) [188 Ill.2d R. 606(c)] has already expired." Fikara, 345 Ill.App.3d at 158, 280 Ill.Dec. 335, 802 N.E.2d 260. The Fikara court held that in light of the trial court's failure to "ensure compliance" with Rule 651(b), the reviewing court must treat the untimely notice of appeal as a petition to file a late notice of appeal and consider the merits of the defendant's postconviction claims. Fikara, *1029 345 Ill.App.3d at 158, 280 Ill.Dec. 335, 802 N.E.2d 260.
We find the decision in Fikara to be well reasoned and agree with its analysis. Here, the trial court initially dismissed three of the four claims in defendant's postconviction petition and ordered an evidentiary hearing on defendant's sentencing claim. After the evidentiary hearing, the trial court granted defendant a new sentencing hearing, thus resolving the final claim from the postconviction petition. Defendant then failed to file a notice of appeal within 30 days of that October 27, 2004, order in which the trial court disposed of all claims from the postconviction petition. However, based on our reading of the record on appeal, the clerk of the trial court failed to comply with Rule 651(b). The clerk of the circuit court failed to give defendant the required notice of an adverse judgment under Rule 651(b). Additionally, the trial court did not admonish defendant about his right to appeal until its ruling at defendant's sentencing hearing. As in Fikara, we must treat defendant's untimely notice of appeal as petition to file a late notice of appeal and consider the issues defendant has raised from the dismissed portion of his postconviction petition.
The Post-Conviction Act (725 ILCS 5/122-1 through 122-8 (West 2000)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2000); People v. Coleman, 183 Ill.2d 366, 378-79, 233 Ill.Dec. 789, 701 N.E.2d 1063 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. Coleman, 183 Ill.2d at 380, 233 Ill.Dec. 789, 701 N.E.2d 1063. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." People v. Evans, 186 Ill.2d 83, 89, 237 Ill.Dec. 118, 708 N.E.2d 1158 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." People v. Barrow, 195 Ill.2d 506, 519, 255 Ill.Dec. 410, 749 N.E.2d 892 (2001). Thus, res judicata bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered waived. Barrow, 195 Ill.2d at 519, 255 Ill.Dec. 410, 749 N.E.2d 892. However, the doctrine of waiver is relaxed where the alleged waiver stems from the incompetence of appellate counsel. People v. Harris, 206 Ill.2d 1, 33, 276 Ill.Dec. 419, 794 N.E.2d 314 (2002). The standard of review for dismissal of a postconviction petition is de novo. Coleman, 183 Ill.2d at 389, 233 Ill.Dec. 789, 701 N.E.2d 1063.
At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2002). If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2002). If the circuit court does not dismiss the postconviction petition as frivolous or patently without merit, then the petition advances to the second stage. Counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122-4 (West 2002)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2002)). At this stage, the circuit court must determine whether the petition and any accompanying *1030 documentation make a substantial showing of a constitutional violation. See Coleman, 183 Ill.2d at 381, 233 Ill.Dec. 789, 701 N.E.2d 1063. If no such showing is made, the petition is dismissed. If, however, a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2002).
"A defendant is not entitled to an evidentiary hearing on a post[] conviction petition as a matter of right." Barrow, 195 Ill.2d at 519, 255 Ill.Dec. 410, 749 N.E.2d 892. "An evidentiary hearing is warranted on a postconviction petition only where the allegations of the petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated." People v. Orange, 195 Ill.2d 437, 448, 255 Ill.Dec. 450, 749 N.E.2d 932 (2001). "In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in accompanying affidavits are taken as true." Orange, 195 Ill.2d at 448, 255 Ill.Dec. 450, 749 N.E.2d 932.
Defendant first contends that the trial court erred in dismissing his claim that his right to conflict-free counsel was violated. Defendant asserts that his trial counsel labored under a conflict of interest because his attorney was from the public defender's office, which also represented defendant's codefendants and a potential witness. The trial court was made aware of the potential conflict when the assistant public defender representing one of defendant's codefendants sought to withdraw due to a potential conflict of interest. Defendant later filed a pro se motion seeking new counsel and included a claim that the continued representation would evince "an absolute conflict of interest." However, the pro se motion did not discuss the conflict of interest in any detail. Defendant claims that the trial court was obligated to conduct an inquiry as to any conflict in defendant's case.
A defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. People v. Hardin, 217 Ill.2d 289, 299, 298 Ill.Dec. 770, 840 N.E.2d 1205 (2005); People v. Morales, 209 Ill.2d 340, 345, 283 Ill.Dec. 544, 808 N.E.2d 510 (2004). In People v. Spreitzer, 123 Ill.2d 1, 14-17, 121 Ill.Dec. 224, 525 N.E.2d 30 (1988), the Illinois Supreme Court outlined the framework for considering conflict of interest cases. Specifically, the court noted the dichotomy between per se conflicts and alleged conflicts. A per se conflict of interest exists where "certain facts about a defense attorney's status were held to engender, by themselves, a disabling conflict." (Emphasis in original.) Spreitzer, 123 Ill.2d at 14, 121 Ill.Dec. 224, 525 N.E.2d 30. When a per se conflict of interest is shown, a defendant is not required to show prejudice resulting from the conflict in order to obtain relief. Spreitzer, 123 Ill.2d at 15, 121 Ill.Dec. 224, 525 N.E.2d 30. A per se conflict is grounds for reversal unless the defendant waived his right to conflict-free counsel. Spreitzer, 123 Ill.2d at 17, 121 Ill.Dec. 224, 525 N.E.2d 30. The supreme court has found a per se conflict when (1) defense counsel had a contemporaneous relationship with the victim, the prosecution, or an entity assisting the prosecution (People v. Lawson, 163 Ill.2d 187, 211, 206 Ill.Dec. 119, 644 N.E.2d 1172 (1994) (collecting cases)), (2) defense counsel contemporaneously represented a prosecution witness (People v. Thomas, 131 Ill.2d 104, 111, 137 Ill.Dec. 1, 545 N.E.2d 654 (1989)), and (3) defense counsel was a former prosecutor who had been personally involved in the prosecution of the defendant (Lawson, 163 *1031 Ill.2d at 217-18, 206 Ill.Dec. 119, 644 N.E.2d 1172).
In the second class of alleged conflicts, reversal is not automatic and sometimes courts have refused to reverse a conviction without some showing that conflict actually affected the attorney's performance. Spreitzer, 123 Ill.2d at 17, 121 Ill.Dec. 224, 525 N.E.2d 30. These types of conflicts have often involved joint or multiple representation of codefendants. Spreitzer, 123 Ill.2d at 17, 121 Ill.Dec. 224, 525 N.E.2d 30. "Treating multiple representation as creating a per se conflict would put an end to multiple representation altogether, since a `possible conflict inheres in almost every instance of multiple representation,' and a per se rule would `preclude multiple representation even in cases where "[a] common defense * * * gives strength against a common attack."'" Spreitzer, 123 Ill.2d at 17, 121 Ill.Dec. 224, 525 N.E.2d 30, quoting Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333, 346 (1980), quoting Glasser v. United States, 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680, 710-11 (1942) (Frankfurter, J., dissenting).
The analysis of an alleged conflict depends on when the issue was raised before the trial court. If the potential conflict is brought to the attention of the trial court by counsel at an early stage, a duty devolves upon the trial court to either appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel. Spreitzer, 123 Ill.2d at 18, 121 Ill.Dec. 224, 525 N.E.2d 30; Holloway v. Arkansas, 435 U.S. 475, 484, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426, 434 (1978). "While this rule is not per se (since it is the attorney's contemporaneous allegations of a conflict and not the mere presence of multiple representation which gives rise to the trial court's duty), reversal of a conviction under this rule does not require a showing that the attorney's actual performance was in any way affected by the purported conflict. In this sense, reversal for the trial court's failure to alleviate possible or potential conflicts does not require a showing of `specific prejudice.'" Spreitzer, 123 Ill.2d at 18, 121 Ill.Dec. 224, 525 N.E.2d 30; quoting Holloway, 435 U.S. at 487, 98 S.Ct. at 1180, 55 L.Ed.2d at 436.
"However, if the trial court is not apprised of the potential conflict, then reversal of the conviction will only be had upon a showing that `an actual conflict of interest adversely affected' counsel's performance." Spreitzer, 123 Ill.2d at 18, 121 Ill.Dec. 224, 525 N.E.2d 30, quoting Cuyler, 446 U.S. at 350, 100 S.Ct. at 1719, 64 L.Ed.2d at 348. "[T]he defendant must point to some specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict." Spreitzer, 123 Ill.2d at 18, 121 Ill.Dec. 224, 525 N.E.2d 30. "While mere speculative or hypothetical conflicts are insufficient to demonstrate [an] actual conflict of interest [citation], a defendant need not prove the conflict contributed to his conviction [citation]." People v. White, 362 Ill.App.3d 1056, 1060, 299 Ill.Dec. 449, 842 N.E.2d 188 (2005).
Here, defendant claims that a per se conflict exists in this case because the public defender's office represented codefendants and Ahumada, a potential witness against defendant. Ahumada's public defender was also listed as a potential witness by the State. Defendant also asserts that a per se conflict exists when counsel represents multiple defendants who are pursuing antagonistic defenses, but the case relied on for this contention, People v. Simmons, 67 Ill.App.3d 1045, 24 Ill.Dec. 617, 385 N.E.2d 758 (1978), predated the supreme court's decision in Spreitzer, which clarified the situations creating a per *1032 se conflict of interest, and the reviewing court in Simmons found the conflict issue to be waived. Moreover, this case does not involve antagonistic defenses. "Defenses are antagonistic when each codefendant implicates the other in the offense and professes his own innocence." People v. McCann, 348 Ill.App.3d 328, 335, 284 Ill.Dec. 89, 809 N.E.2d 211 (2004). Here, codefendants gave statements to the police that implicated defendant, but none of the codefendants were tried jointly with defendant nor did they testify at defendant's trial. These facts distinguish this case from cases that successfully raised the presence of antagonistic defenses as the basis for a conflict of interest. See White, 362 Ill.App.3d at 1061, 299 Ill.Dec. 449, 842 N.E.2d 188 (actual conflict of interest was shown where attorney represented codefendants tried together and cross-examined a witness to benefit one codefendant at the expense of the other).
Defendant argues that the representation of codefendants and a potential witness by the public defender and the inclusion of an assistant public defender as a potential witness gave rise to a per se conflict of interest. Defendant implies in his argument that because a conflict of interest existed for codefendant Hamill, a conflict of interest existed for him as well. Defendant further asserts that the trial court received notice of the conflict in defendant's case when codefendant Hamill's public defender raised her conflict claims and was therefore required to perform an inquiry as to how the conflict affected defendant. Defendant relies on Spreitzer and Holloway, to support his assertion that the trial court was obligated to consider whether a conflict of interest existed in his case.
We find the supreme court's decision in Morales to be instructive. In Morales, the court reversed the appellate court's finding of a per se conflict of interest when the defendant's attorney also represented a prosecution witness. The reviewing court found that since the witness represented by defendant's attorney never testified at trial, defense counsel never assumed the role of attorney for a prosecution witness and declined to find a per se conflict. Morales, 209 Ill.2d at 346, 283 Ill.Dec. 544, 808 N.E.2d 510. The supreme court further explained that nothing in the record indicated that the witness stood to gain anything in a verdict against the defendant. Morales, 209 Ill.2d at 346-47, 283 Ill.Dec. 544, 808 N.E.2d 510.
In the instant case, none of defendant's codefendants, Ahumada, or his attorney testified at defendant's trial. Nothing was presented at defendant's trial that implicated the public defender's office as representing conflicting interests. Based on the supreme court's decision in Morales, we find that there was no per se conflict of interest since at defendant's trial the only interest represented by the public defender's office was defendant's.
Additionally, in Morales, the supreme court clarified its holding in Spreitzer that a trial court has a duty to either appoint separate counsel or take adequate steps to ascertain whether the risk of conflict was too remote to apply only when defense counsel informs the court of the potential conflict. Morales, 209 Ill.2d at 347-48, 283 Ill.Dec. 544, 808 N.E.2d 510. The Morales court noted that the United States Supreme Court confirmed that the rule in Holloway of automatic reversal applies only when a trial court fails to respond appropriately to defense counsel's objection to a representation. Mickens v. Taylor, 535 U.S. 162, 168, 122 S.Ct. 1237, 1241-42, 152 L.Ed.2d 291, 302 (2002). The Morales court declined to apply Holloway in that instance because neither defense counsel nor defendant raised the potential *1033 conflict. Morales, 209 Ill.2d at 348, 283 Ill.Dec. 544, 808 N.E.2d 510.
It is undisputed that defendant's trial counsel did not raise a potential conflict of interest before the trial court, but defendant asserts that the trial court should have conducted an inquiry in defendant's case based on the conflict issue raised in codefendant Hamill's case. Additionally, defendant contends that he raised the issue before the trial court in his pro se motion for appointment of counsel other than the public defender. The only mention of a conflict of interest was:
"Defendant avers that his rights have been and shall continue to be substantially harmed and prejudiced by the continued representation of appointed counsel, evincing an absolute conflict of interest [citations omitted] in order to receive meaningful and effective assistance and zealous advocacy of counsel."
Defendant did not assert any facts relating to a conflict of interest. The mere mention of "an absolute conflict of interest" was not sufficient to make the trial court aware of any conflict as it relates to defendant. In the context of a potential conflict between two public defenders, the conflict issue will normally be raised by the defendant. Hardin, 217 Ill.2d at 303, 298 Ill. Dec. 770, 840 N.E.2d 1205. Consequently, the defendant needs only to present the gist of such a conflict. "The defendant must sketch, in limited detail, a picture of how the working relationship between the public defenders created an appearance of impropriety." Hardin, 217 Ill.2d at 303, 298 Ill.Dec. 770, 840 N.E.2d 1205. "Relevant factors include whether the two public defenders were trial partners in the defendant's case [citations]; whether they were in hierarchical positions where one supervised or was supervised by the other [citations]; or whether the size, structure, and organization of the office in which they worked affected the closeness of any supervision [citations]." Hardin, 217 Ill.2d at 303, 298 Ill.Dec. 770, 840 N.E.2d 1205. Even though the threshold is low, defendant's pro se motion makes no mention of what conflict of interest existed and does not discuss his codefendants or the public defender's office's multiple representations. Based upon these facts, defendant did not raise the gist of a claim of a conflict of interest.
Moreover, defendant has not cited any authority to support his assertion that the trial court was obligated to conduct an inquiry in defendant's case based on the conflict of interest raised in codefendant Hamill's case. Nothing in Holloway and Spreitzer requires a trial court to sua sponte conduct an inquiry in a defendant's case based on motions brought in a codefendant's case. In addition, the Illinois Supreme Court has held that "in determining whether a conflict of interest exists, individual attorneys who comprise the staff of the public defender, unlike members of a private law firm, are not members of an entity, `which should be subject to the rule that if one attorney is disqualified by reason of a conflict of interest then no other member of the entity may continue with the representation.'" People v. Brown, 172 Ill.2d 1, 44, 216 Ill.Dec. 733, 665 N.E.2d 1290 (1996), quoting People v. Robinson, 79 Ill.2d 147, 159, 37 Ill.Dec. 267, 402 N.E.2d 157 (1979). In cases involving the public defender's office, the trial court must conduct a case-by-case inquiry to determine whether the risk of a conflict colored the defendant's representation, but only when the potential conflict is brought to the court's attention. Hardin, 217 Ill.2d at 302, 298 Ill.Dec. 770, 840 N.E.2d 1205; see also People v. Banks, 121 Ill.2d 36, 117 Ill.Dec. 266, 520 N.E.2d 617 (1987).
Based on the foregoing analysis, we find that a potential conflict relating to defendant's *1034 representation by the public defender's office was not brought to the attention of the trial court before trial, and therefore, the trial court was not obligated to conduct an inquiry.
Next, we look to see if defendant has alleged any defect in his representation attributable to the conflict. Under Spreitzer, reversal of the conviction will only be had upon a showing that an actual conflict of interest adversely affected counsel's performance and defendant must point to some specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict. Spreitzer, 123 Ill.2d at 18, 121 Ill.Dec. 224, 525 N.E.2d 30. Here, defendant has not alleged any defect in his trial counsel's performance related to the potential conflict of interest. Accordingly, we find that defendant has not shown that his trial counsel labored under an actual conflict of interest that adversely affected his performance.
Defendant next argues that the existing Illinois Supreme Court case law for examining conflicts within the public defender's office differently than a law firm violated defendant's equal protection. We need not review defendant's equal protection argument because defendant lacks standing to raise it. Standing in Illinois requires only some injury in fact to a legally cognizable interest. Greer v. Illinois Housing Development Authority, 122 Ill.2d 462, 492, 120 Ill.Dec. 531, 524 N.E.2d 561 (1988). Since we have found that defendant was not deprived of his right to conflict-free representation, he "`is not aggrieved by the alleged deprivation of equal protection and consequently lacks standing to raise this issue.'" People v. Campa, 217 Ill.2d 243, 268, 298 Ill.Dec. 722, 840 N.E.2d 1157 (2005); quoting People v. Boykin, 94 Ill.2d 138, 147, 68 Ill.Dec. 321, 445 N.E.2d 1174 (1983).
Next, defendant asserts that the trial court did not make an adequate inquiry into his pro se claim that his trial counsel was neglecting his case. The State maintains that the trial court conducted an adequate inquiry into defendant's motion, and the trial court properly dismissed this postconviction claim.
The following discussion took place when the trial court considered defendant's pro se motion:
"THE COURT: You're telling me that your phone calls are not accepted at the Public Defender's office?
THE DEFENDANT: Well
THE COURT: That's what this says. Number three says, the defendant's phone calls have not been accepted by that office. Is that what you are saying?
THE DEFENDANT: Well, I(inaudible)
THE COURT: So that's not true, right?
THE DEFENDANT: No, sir.
THE COURT: So, point number three, part of it is not true. I'll scratch it off. His phone number is available. Your phone number is available to him, is that correct? You have voice mail?
MR. MORIARTY [Defendant's attorney]: Yes.
THE COURT: Has he ever called you?
MR. MORIARTY: No.
THE COURT: You gave him that phone number, right?
MR. MORIARTY: Yes, sir.
THE DEFENDANT: Sir, I never got a phone number from him to call him.
THE COURT: Did you call anyone in the Public Defender's Office?
THE DEFENDANT: I never had a number.

*1035 THE COURT: I'm quite certain that his phone number is available in the County Jail, and it's easily attainable, and you could have called if you needed to contact your lawyer.
You could have called the Public Defender's office, and they would give you Mr. Moriarty's phone number, if it is in fact true that you don't have his phone number.
THE DEFENDANT: Out of all due respect to Mr. Moriarty, I need to find out what's going on with my case, you know, and he really doesn't tell me anything that I need to know, you know.
THE COURT: Well, we had an extensive conference back in August, August 11th. I made an offer. And all I can tell you is that your attorney represented you during that conference, and spoke up on your behalf, and did a competent and commendable presentation during that conference.
THE DEFENDANT: I didn't really want to go into the 402 conference. It was a mistake.
THE COURT: Well, I asked you, and you said you did. So maybe now you are having afterthoughts about it, and I respect that. But you neverI asked you particular questions, and you said you wanted me to discuss the case.
In any event, I have read through your motion, and I find it to be without merit and frivolous.
Mr. Moriarty has practiced before me many years. He's well experienced. He used to be a Chicago police officer. He's been a lawyer for many years and there's nothing in here that tells me that he's not doing anything but his job. And he's more than happy to meet with you and discuss your case with you.
I'm not going to appoint anyone outside of the Public Defender's office to represent you. So now, if they want to change the attorneys to the Multiple Defendants' unit and give you a different lawyer, that's up to them, but I'm not going to appoint somebody outside of the Public Defender's office to represent you. So, your motion is denied."
Defendant cites to the supreme court decision in People v. Moore, 207 Ill.2d 68, 278 Ill.Dec. 36, 797 N.E.2d 631 (2003), for support. In Moore, the defendant filed a pro se motion for appointment of new counsel with the trial court during pretrial discovery and then after trial filed a second pro se motion seeking new counsel. Moore, 207 Ill.2d at 76-77, 278 Ill.Dec. 36, 797 N.E.2d 631. The trial court's only response to the defendant's posttrial motion was to appoint the State Appellate Defender as counsel on appeal. Moore, 207 Ill.2d at 77, 278 Ill.Dec. 36, 797 N.E.2d 631.
The supreme court held that when a defendant files a pro se posttrial claim of ineffective assistance of counsel, the trial court must conduct an inquiry into the factual basis of the claim. Moore, 207 Ill.2d at 78, 278 Ill.Dec. 36, 797 N.E.2d 631. "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the pro se motion." Moore, 207 Ill.2d at 78, 278 Ill.Dec. 36, 797 N.E.2d 631. "During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." Moore, 207 Ill.2d at 78, 278 Ill.Dec. 36, 797 N.E.2d 631. The evaluation can include asking the trial counsel questions to explain the facts and circumstances of the motion and a brief discussion between the *1036 trial court and the defendant. Moore, 207 Ill.2d at 78, 278 Ill.Dec. 36, 797 N.E.2d 631. Also, the trial court can base its evaluation of the ineffective assistance claims on its observations of the defendant's attorney at trial and the insufficiency of the defendant's allegations on its face. Moore, 207 Ill.2d at 79, 278 Ill.Dec. 36, 797 N.E.2d 631.
Here, we find that the trial court conducted a sufficient inquiry into the allegations in defendant's pro se motion. The trial court inquired into the preparation of the motion with defendant and also asked about defendant's claim that his trial counsel would not accept his calls. Defendant then admitted that allegation was false. The trial court indicated on the record that it found defendant's motion to be without merit based in part on its observations of defense counsel's representation of defendant during the Rule 402 conference. These observations of defendant's attorney's performance are part of a proper evaluation under Moore. Additionally, at the hearing on defendant's postconviction petition, the trial court further explained its considerations of defendant's pro se motion. The court noted that "the most compelling part of the inquiry" was that in response to the first question asked of defendant, defendant admitted that he lied. The court also stated that defendant's "claims basically were of a general nature, that his attorney wouldn't talk to him, he calls him, wouldn't accept his phone calls and he only talked to him in the bull pen." The court said that defendant made those allegations and then later admitted that petitioner never called his attorney, saying his attorney never gave defendant his phone number. The trial court weighed defendant's allegations, in which he admitted to fabricating in part, against its knowledge of defense counsel's performance in the case, and concluded that the pro se motion was without merit. We find that the trial court properly considered defendant's pro se motion and made a decision based on its evaluations. Accordingly, the trial court properly dismissed this issue in defendant's postconviction petition.
Defendant's last argument on appeal is that the trial court abused its discretion in sentencing defendant to 44 years' imprisonment on his first degree murder conviction. Defendant asserts that the trial court failed to give proper weight and consideration to the mitigating evidence presented at his sentencing hearing. The State maintains that the trial court did not abuse its discretion because defendant's sentence is within the statutory limits and the trial court properly considered the aggravating and mitigating factors in sentencing.
"Although the legislature has prescribed the permissible ranges of sentences, great discretion still resides in the trial judge in each case to fashion an appropriate sentence within the statutory limits." People v. Fern, 189 Ill.2d 48, 53, 243 Ill.Dec. 175, 723 N.E.2d 207 (1999). "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. Fern, 189 Ill.2d at 53 [243 Ill.Dec. 175, 723 N.E.2d 207]." "The sentencing judge is to consider `all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.'" Fern, 189 Ill.2d at 55, 243 Ill.Dec. 175, 723 N.E.2d 207, quoting People v. Barrow, 133 Ill.2d 226, 281, 139 Ill.Dec. 728, 549 N.E.2d 240 (1989). "In reviewing a claim that a sentence within statutory limits is excessive, the court *1037 must consider whether, given the particular facts of the case, the sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." Fern, 189 Ill.2d at 55-56, 243 Ill.Dec. 175, 723 N.E.2d 207. Supreme Court Rule 615(b)(4) allows a reviewing court to reduce a sentence imposed by the trial court where the record discloses that the trial court abused its discretion. 134 Ill.2d R. 615(b)(4).
Under section 5-8-1 of the Unified Code of Corrections, the sentencing range for first degree murder is 20 to 60 years' imprisonment. 730 ILCS 5/5-8-1(a)(1)(a) (West 2000). Defendant received a sentence of 44 years, which is within the statutory range. The crux of his argument is that the trial court did not consider the mitigating evidence because he only received a sentence that was two years less than his previous sentence. Defendant presented the live testimony of several family members and friends as well as two expert witnesses and several affidavits.
Mayra Ramos and her children Kristian Tellado and Jessica Flores testified on defendant's behalf. Tellado testified that he and defendant are like "brothers." Tellado and Flores met defendant when Tellado moved into the neighborhood. Flores stated that defendant came by to help them move. Flores testified that she dated defendant for a while. Flores said that defendant asked her mother's permission to date Flores. Defendant spent a lot of time at the family's house. Ramos said that defendant called her "Mom." When defendant spent the night at their house, defendant slept on the couch or in the boys' room. Tellado and defendant worked together at Wrigley Field concessions. All of them described defendant as respectful, especially toward Ramos. Flores stated that defendant would help her babysit and would clean her house. Ramos said that defendant treated her children like brothers and sisters. Flores would also help defendant babysit his younger siblings. She said he took care of his younger siblings and made sure they did not get into trouble.
Tellado and Flores described the neighborhood as having a strong gang presence. Tellado saw gang members "all day, every day." Tellado and Flores did not know defendant was in a gang when they first met. Tellado later asked defendant if he was in a gang. Tellado was surprised and disappointed because defendant was "outgoing" and had "a good spirit." Tellado testified that defendant was not a typical gang member and he was not proud of it. Tellado said that defendant "knew it hurt him" and it "wasn't who he was." Defendant told Tellado he wanted to leave the gang, but he was afraid of being hurt through a violation.
Flores also asked defendant if he was in a gang after she saw a tattoo of two initials on his arm. She was very surprised because defendant "didn't carry himself as one." Defendant did not spend time with the gang because he was with Flores. Flores and defendant also discussed his desire to leave the gang and his fear of consequences. None of them ever saw defendant conduct gang business or bring a weapon into their home.
Ramos stated that defendant came to her and told her about his gang membership. She said she was very upset and lectured him. Defendant told her he wanted to leave the gang. Ramos helped by keeping him occupied in the house. Ramos described defendant as "respectful," "honorable," and "would carry himself right."
Later, Tellado and his family moved to East Chicago, Indiana, and they invited *1038 defendant to move with him. Defendant did not want to leave his family. Tellado stayed behind to finish school and lived with defendant for a few months after Tellado's family left Chicago. Flores said that defendant would often visit her family in Indiana. Tellado stated that defendant was arrested within five to seven months after Tellado moved to Indiana. Flores testified that she continued to visit defendant while he was in prison and she said he has matured and that he "knows now there is more to life to offer him and he can actually reach out and could have [taken] it."
Defendant's mother, Aixa Martinez, also testified. She said that defendant's biological father was abusive and he left when defendant was two or three years old. Since then, she has been in a relationship with Michael Vera and she had two children with Vera. Martinez testified that she is epileptic and that defendant often helped her after her seizures by caring for his younger siblings. She trusted defendant with his siblings because he was a responsible kid and she knew he could handle it.
When Martinez found out that defendant was in a gang, they discussed it. She said he was not proud of being in a gang. It was hard for her to cope with it because defendant was not like gang members, in that, he was responsible and helpful. She talked with defendant about leaving the gang, but he was afraid of what might happen to his siblings and himself. Martinez helped defendant avoid the gang members by saying he was not at home when they came to look for him. Defendant wanted to leave the neighborhood, but the family could not afford it.
Martinez said that defendant left the neighborhood twice. Once he went to Florida to live with Martinez's mother, but he returned after a few months because he missed his family. Later, defendant heard about the Lincoln's Challenge program from Tellado, which defendant attended. Defendant earned his GED there. Martinez said that it was defendant's idea to attend the program. Martinez also said that nothing happened to her family either time defendant left.
Dorothy Papachristos testified as a gang expert and she also had personal contact with defendant. Papachristos started a not-for-profit agency called Community Dare to Care, which aims to take kids out of gangs and reconnect them with their families. One program the agency offers is a gym program in which kids in gangs or at risk kids come in and play basketball two evenings a week. She met defendant through this program.
Papachristos also discussed the structure of the Latin Kings. She said that gang is very structured with a defined hierarchy with a cosinca and sinca at the top. The low members, foot soldiers, take instruction from higher-ranked members.
Papachristos was impressed with defendant because he came to her, introduced himself and shook her hand. Defendant seemed to be a peace maker. She said if a fight broke out at the gym, defendant would try to help her calm it down. Papachristos found defendant's behavior to be different than typical gang members in the program. She said that other gang members were "really aggressive" and "tried to, you know, conduct gang business in front of [her]." Defendant, in contrast, never behaved that way. She discussed defendant's desire to leave the gang with him, but he was afraid for his family. Papachristos said that was a reasonable fear. She also stated that defendant leaving to go to Florida for a few months and his participation in Lincoln's Challenge was not sufficient to leave the gang. She testified that defendant was not successful *1039 in leaving the gang because he was not "strong enough."
Papachristos also saw defendant outside of the gym program. He befriended one of her foster sons and he spent time at her house. She said defendant always made it a point to clean up after himself and to help in whatever way he could.
Papachristos has visited defendant in prison and said that he has matured. He left the Latin Kings while in prison. She believed he could be rehabilitated. Papachristos admitted that she had not discussed the specifics of the offense with defendant, but reiterated that she thinks he can be rehabilitated.
Dr. Ruben Gur testified that he is a neuropsychologist. He offered expert testimony about how brain development impacts behavior. Dr. Gur discusses how parts of the brain develop at different rates. According to Dr. Gur, the frontal lobe is responsible for integrating "all the information in relation to the context." When other parts of the brain react to an outside event, the frontal lobe will put that initial reaction into the context of the situation. A process called myelination occurs to enhance brain function by increasing the speed in which impulses travel throughout the brain. Dr. Gur said that babies have no myelin in their brains and as a result the signals for reaction dissipate and babies cannot control their responses. Myelination occurs throughout all parts of the brain with the frontal lobe developing last.
Dr. Gur testified about several studies that have been conducted to study myelination in the brain. In the studies, it was shown that myelination is not completed in the frontal lobe until the "third decade of life," or around age 22. Dr. Gur stated that in adolescents the result is that they will act on impulse, but after their actions, they will be able to understand what was wrong about their actions. The frontal lobe is not able to put the impulsive actions into context fast enough.
Dr. Gur admitted that he never studied defendant's brain. He said that these findings about brain development are generally accepted in his field with "very little disagreement, if any." Dr. Gur said that with adolescents, they have a hard time changing their course of action because they are not able to understand the full context and the frontal lobe is not fully able to provide that context. Dr. Gur stated that he gave a presentation on adolescent brain development before the American Bar Association in Washington, D.C., and his opinion at trial was the same as it was in the presentation.
Additionally, defendant offered affidavits from nine other family members and friends. These affidavits also described defendant as a respectful and polite teenager and not a typical gang member. Defendant tried to keep his younger brother and other friends from joining a gang. These family members and friends also stated that defendant wanted to leave the gang, but was afraid.
Finally, defendant gave the following statement of allocution.
"My reason for standing here today, You Honor, because I want to take this opportunity which I think, I wish I had said a long time ago. But honestly didn't have the courage to. To Mrs. Soberon, I told you how sorry I am for causing you and your family so much pain through the years. I don't want you to think the one reason I'm standing here pretending how I understand what it feels like to lose a child because I don't. I wish I had sorry words to say to you. But I want you to know, I didn't mean for this to happen. And I know that by me telling you how sorry I am *1040 isn't enough to make younot bring your son back to you. But I do hope from my words somehow play a part in helping you find a piece [sic.] within that you can lead because I am sorry. I'm so sorry for the trauma I gave you. I really am. I really am.
I'd like to apologize to my family and friends, especially my daughter.
I'm sorry, Your Honor, to Mrs. Soberon, I am so sorry. I wanted to tell you I'm sorry. Thank you."
The State did not present any live testimony at the sentencing hearing. The State offered a victim impact statement from Soberon's mother and the presentence investigation. According to the presentence investigation, defendant's only prior conviction was for disorderly conduct and he was fined $71.
In making its ruling, the trial court discussed defendant's decision to join a gang and his decision to participate in the shooting death of Soberon. The court noted that defendant had supportive family and friends, and yet he still chose to be in a gang. The court recognized that the mitigating evidence indicated that defendant wanted to leave, but feared repercussions. However, the court considered it and found defendant did walk away from the gang and nothing happened to him. The court stated that "[t]here was no hard evidence that he was in fear for his life." The court found that defendant did well in the structured environment of Lincoln's Challenge, but once outside of that environment he went back to the gang and committed murder. The court concluded that defendant was someone who needed to be in a structured environment for a long time.
As for Dr. Gur's testimony, the trial court found it to be "very fascinating," but it had "very little value here" because the study had nothing to do with defendant. The court noted that the testimony of defendant's friends and family was that he was a mature and respectful person, which "really destroys any far fetched argument that he had a frontal lobe that wasn't developed." The court also found that Papachristos' "testimony wasn't very helpful in any way" other than the fact that defendant had a relationship with her and followed her rules. After discussing its thoughts on the evidence, the trial court sentenced defendant to a term of 44 years' imprisonment.
In People v. Brown, 243 Ill.App.3d 170, 171, 183 Ill.Dec. 757, 612 N.E.2d 14 (1993), the defendant was charged with the first-degree murder in the shooting death of Stephen Anderson. One of the defendant's codefendants, Eric Langham, sold a car to the victim's brother, Jonathan Anderson, but they got into a dispute after the sale. Langham asked Jonathan to meet him to discuss the problem. The victim and two others came with Jonathan to meet Langham. Langham grabbed Jonathan by his neck and put a gun against his head. Brown, 243 Ill.App.3d at 171-72, 183 Ill.Dec. 757, 612 N.E.2d 14. The victim began to approach when "gunfire erupted from several different places." Brown, 243 Ill.App.3d at 172, 183 Ill.Dec. 757, 612 N.E.2d 14. Multiple witnesses identified the defendant as one of the individuals seen firing a gun at the scene. Brown, 243 Ill.App.3d at 172, 183 Ill.Dec. 757, 612 N.E.2d 14. The defendant was sentenced to a 45-year term of imprisonment. Brown, 243 Ill.App.3d at 173, 183 Ill.Dec. 757, 612 N.E.2d 14. On appeal, the reviewing court reduced the 45-year sentence to 20 years because the defendant was 20 years old at the time of the offense and lacked any prior criminal history. The court found that for these reasons the defendant's "rehabilitative potential was not adequately considered." *1041 Brown, 243 Ill.App.3d at 176, 183 Ill.Dec. 757, 612 N.E.2d 14.
Similarly, in People v. Maldonado, 240 Ill.App.3d 470, 473, 181 Ill.Dec. 426, 608 N.E.2d 499 (1992), the defendant was charged with the first-degree murder of Elizabeth Cooley. Cooley was a passenger in a car with four others. As they were driving, the car encountered Efrain Nunez, who was standing in the street. Nunez hit the roof of the car with his hand. The driver and two passengers got out of the car. Maldonado, 240 Ill.App.3d at 473, 181 Ill.Dec. 426, 608 N.E.2d 499. One of the passengers testified that Nunez yelled something about the Latin Kings and then two individuals came out and joined Nunez. Maldonado, 240 Ill.App.3d at 473, 181 Ill.Dec. 426, 608 N.E.2d 499. Then, another car arrived at the scene and the occupants joined the altercation on Nunez's side. The defendant was identified as one of the occupants of the car. Maldonado, 240 Ill.App.3d at 474, 181 Ill.Dec. 426, 608 N.E.2d 499. The defendant pulled out a gun and confronted one of the passengers of the car. The driver got back in the car and started to drive. Three to seven gunshots were heard by various witnesses. According to witness testimony, the defendant was the only person with a gun. Maldonado, 240 Ill. App.3d at 474, 181 Ill.Dec. 426, 608 N.E.2d 499. The two passengers got back into the car at stoplight and they noticed Cooley was bleeding. They took her to a hospital, where she later died. Maldonado, 240 Ill.App.3d at 474, 181 Ill.Dec. 426, 608 N.E.2d 499. The defendant was sentenced to the maximum term of 40 years. Maldonado, 240 Ill.App.3d at 474, 181 Ill.Dec. 426, 608 N.E.2d 499.
The defendant argued on appeal that the trial court abused its discretion in sentencing him to the statutory maximum. Maldonado, 240 Ill.App.3d at 484, 181 Ill.Dec. 426, 608 N.E.2d 499. The defendant was 20 years old at the time of the offense, the father of two small children, engaged to the children's mother, had completed three years of high school, and had no prior felony convictions. Maldonado, 240 Ill. App.3d at 484, 181 Ill.Dec. 426, 608 N.E.2d 499. The Maldonado court stated that "[a] sentence imposed for the offense of murder is as amenable to the scope of an appellate court's power of reduction as any other offense" and then referenced several prior decisions in which a defendant's sentence for murder was reduced on appeal. Maldonado, 240 Ill.App.3d at 485, 181 Ill. Dec. 426, 608 N.E.2d 499, citing People v. Crews, 42 Ill.2d 60, 66, 244 N.E.2d 593 (1969) (after noting that society is outraged by the murder of a child, the Illinois Supreme Court reversed the death penalty sentence and imposed a 20- to 35-year term of imprisonment on the defendant); People v. Wilkins, 36 Ill.App.3d 761, 767, 344 N.E.2d 724 (1976) (the court reduced the penalty imposed by the trial court where the defendant was 17 years old, had no prior criminal record, was attending high school, and had the possibility of rehabilitation); People v. Mitchell, 12 Ill. App.3d 960, 968, 299 N.E.2d 472 (1973) (after acknowledging that the defendant's "shooting the gun into the crowd of people cannot be condoned," the court reduced the defendant's sentence where he was 20 years old at the time of the offense and had a minimal prior criminal record); People v. Adams, 8 Ill.App.3d 8, 13-14, 288 N.E.2d 724 (1972) (the sentence of an 18-year-old defendant who had three prior misdemeanor convictions was reduced after the court expressly "recognize[d] the heinous nature of the crime committed"). The reviewing court then reduced the defendant's sentence from 40 years to 20 years after concluding that "the circumstances revealed in this record do not justify the imposition of the maximum sentence *1042 allowed by statute." Maldonado, 240 Ill.App.3d at 486, 181 Ill.Dec. 426, 608 N.E.2d 499.
Here, defendant was 18 years old at the time of the offense, had received a GED, and had no prior felony convictions. Defendant presented extensive evidence in both live testimony and affidavits from family members, friends, and experts discussing his rehabilitative potential. Defendant was described as a respectful and polite young man who made a bad decision in joining a gang. Several people disclosed defendant's desire to leave the gang, but his fear of retribution from the gang against himself and his family kept him from leaving. Defendant offered the expert testimony of Papachristos to illustrate both defendant's atypical behavior for a gang member and the structure and circumstances of Chicago gangs. Dr. Gur testified about generally accepted studies involving the brain development in adolescents. Defendant also offered his own apologies to Soberon's family. The trial court dismissed the testimony of Dr. Gur and found that Papachristos did not offer anything helpful.
While we acknowledge that the 44-year sentence imposed was within the sentencing ranged allowed and we acknowledge the trial court's assessment that "[t]his was a cold-blooded attack on innocent individuals riding in a car by self-admitted gang members who laid in the weeds waiting for their prey to attack them," we find that the trial court did not fully consider the mitigating evidence presented at defendant's sentencing hearing, particularly in light of defendant's age and lack of any significant criminal background at the time of the murder. Accordingly, under the authority of Supreme Court Rule 615(b)(4) (134 Ill.2d R. 615(b)(4)), we reduce defendant's sentence for murder from 44 years to 36 years.
For the foregoing reasons, the dismissal of counts I, II, and IV of defendant's post-conviction petition is affirmed and defendant's sentence is reduced to 36 years.
Affirmed as modified.
GARCIA and R. GORDON, JJ., concur.